(No. 21038.—

ELSIE MORECRAFT *et al.* Appellants, *vs.* FLOSSIE ELIZABETH FELGENHAUER *et al.* Appellees.

*Opinion filed December 17, 1931.*

WETTEN, PEGLER & DALE, (JAMES P. HAFFNER, and GREYDON L. WALKER, of counsel,) for appellants.

CASTLE, OSBORN & WEISS, (HARPER E. OSBORN, of counsel,) for appellees.

Mr. JUSTICE ORR delivered the opinion of the court:

This appeal by the appellants (complainants in the court below and herein called contestants) is for the purpose of securing a reversal of the decretal order of the circuit court of Lake county dismissing their bill of complaint for want of equity. By their bill the contestants, Elsie Morecraft and Myrtle Wienecke, sought to declare the last will and testament of Job Thompson invalid, alleging unsoundness of mind and undue influence. Thompson resided in Lake county for many years, where he followed the business of farming and stock dealing. On June 2, 1928, he went to Barrington, in Lake county, where he executed an instrument purporting to be his last will and testament. He died on April 30, 1929, leaving as his sole heirs-at-law the following designated persons: The contestants and Flossie E. Felgenhauer, who were the surviving children of a deceased daughter, Kate Leonard; William Thompson, a son; Sarah Thompson, an invalid daughter; Mabel Thompson, a daughter, and Donald Thompson, a grandson. By his will the testator devised one-fourth of his estate to Flossie and the remaining three-fourths to the other heirs in varying proportions, except that the contestants received nothing. The bill alleges that this particular disposition of his estate was made by Thompson for two reasons: First, because he was not of sound mind and memory at the time he executed the will but was in his dotage and so impaired in

mind and memory as to be incapable of making a proper distribution of his estate or one that he actually desired; and second, that Flossie Felgenhauer, the sister of the contestants, exercised improper and undue influence over Thompson about the time the will was made by making certain representations to him which she knew to be false and fraudulent. The bill further alleges that the representations made by Flossie were that her father, William Leonard, had not provided for her in his will, so that her father's estate would be divided between her sisters, the contestants, and that she also represented to the testator that the contestants would not care for the invalid daughter, Sarah, in the event of his death but that she would do so. The bill further charges that Flossie wrote out the names of the legatees in the will and induced the testator by the false representations to execute the same. The defendants filed their joint and several answer, admitting the relationships alleged, the making of the will and its probate and admission to record, but denied the alleged unsoundness of Thompson's mind and the exercise upon him of the undue influence and fraudulent representations set forth in the bill. Issue was joined and the evidence heard by a jury. After the contestants and the proponents had produced their evidence before the jury the proponents presented a motion asking the court for a directed verdict establishing the will. This motion was allowed and a decree was entered upon the verdict, dismissing the bill for want of equity.

The contestants first complain that the trial court committed error in granting the motion to direct a verdict because there was evidence presented which, taken with all of its reasonable intendments and inferences, fairly and reasonably tends to sustain the issues raised by the bill. In support of this contention they called the chief defendant, Flossie Felgenhauer, if we may so characterize her, as one of their witnesses. She said that she had never talked to

Thompson about making his will and did not know he had made one until about six months before his death.

Mabel Thompson, another defendant, called as a witness for the contestants, told how she had been sick and Flossie had come to Thompson's and worked. During this illness Flossie had said to Thompson and Mabel that she (Flossie) would be glad to take care of the invalid, Sarah, if anything happened to Mabel. Mabel further said that she had never seen a list of the beneficiaries of the will before she saw the instrument itself, nor could she recall any conversations with Flossie with reference to being left out of William Leonard's will. She knew of no conversations between Flossie and Thompson with respect to his will, either before or after it was executed. She recalled nothing about an alleged conference held in a cemetery on the Decoration day succeeding Thompson's death, which she was charged with attending or participating in with William Thompson, George Spunner and the two contestants.

William Thompson, another defendant, was put on the stand to produce testimony favorable to the contestants. He said that the testator, about twenty years ago, being then sixty-two years of age, was in a runaway and was thrown out of the wagon, landing on his head. He said seven days elapsed before he was able to speak, but that witness had noticed no after-effects, except that he would be a little disagreeable when sick. Witness was not able to recall the conference in the cemetery in which he was alleged to have participated. He was asked by counsel for the contestants if at that conference he said, in effect, that Thompson was crazy ever since he was in the runaway. The court would not permit an answer to this question.

George Spunner, an attorney "part of the time," testified that he had known Thompson for twenty years and had done some legal work for him. He told of meeting him about nine o'clock one stormy night in June, about two years previously, while driving along a highway. He picked

Thompson up and inquired why he was walking home when his barn was full of horses. According to him, Thompson replied that the young folks at the farm would not drive him down. Spunner asked him what business had taken him to town, and he replied that he had been to the bank and made his will and had gotten even with some of his folks by so doing. Spunner recalled the conference in the cemetery which Mabel Thompson attended, but he was not allowed to state what Mabel said there, on the ground that all of the beneficiaries were not present. The contestants then placed on the stand William Leonard, father of the two contestants and Flossie Felgenhauer. By him they endeavored to show that Flossie was provided for in his will and that her statements in that respect were false. The court would not permit Leonard's will to be introduced in evidence nor allow him to relate his business dealings with his son-in-law.

August Hawk testified for the contestants that he lived about a mile from Thompson, had known him for ten or fifteen years, and had seen him on an average of once or twice a month for the three years prior to his death. He said Thompson ran a dairy farm and bought and sold cows; that about three years before his death he was beating and cursing a team of horses in an open field; that witness remonstrated with him, and the latter told him to mind his own business. Hawk had a business deal with Thompson in which Hawk was worsted and contemplated suing Thompson but was dissuaded. He once asked Thompson why he did not fix up his home for his daughters, and he said he would do nothing for them as the girls never talked to him. Hawk then told the daughters what Thompson had said, and they replied it was no use talking to their father as he "flew off the handle" easily, so they left him alone. In conclusion Hawk said he did not believe that Thompson was of sound mind when he had his business deal with him a short time before his death and did not think he

was ever of sound mind, as it looked silly for a man to be beating his team in the field.

Albert Robertson, the executor and trustee under the will, also testified for the contestants. All that he could say was that the will had never been in his possession before Thompson died and he did not know whether Thompson ever took the will out of the bank. Robertson said he could not recall having telephoned Mabel Thompson, just before the death of the testator, to bring the will back to the bank. He further stated that he could recall no conversation with Thompson concerning the will or of his asking if he could cross the name of Flossie Felgenhauer out of the will.

The proponents introduced the testimony of the subscribing witnesses, the competency of the testator to make the will, and that the will was signed and attested in the manner required by statute, thus *prima facie* establishing the will. The law presumes every man to be sane and of sound mind until the contrary is proved, and the burden of proof rests upon the party alleging insanity. (*Menkins* v. *Lightner*, 18 Ill. 282; *Argo* v. *Coffin*, 142 id. 368; *Egbers* v. *Egbers*, 177 id. 82.) The law also throws the weight of this presumption into the scale in favor of the one relying upon the will. (*Egbers* v. *Egbers, supra.*) There is a total lack of evidence adduced on the part of the contestants tending to prove that Thompson was not of sound and disposing mind and memory. Hawk is the only witness for the contestants who said Thompson was not of sound mind. No weight can be accorded to his testimony due to the absence of foundation upon which his opinion is based. What this court said in *Schneider* v. *Manning*, 121 Ill. 376, is pertinent here: "A man may become prejudiced against some of his children, and that, too, without proper foundation; and because he may make unjust remarks against them—remarks not warranted by the facts—it does not follow that he has insane delusions or

that he is devoid of testamentary capacity. If such was the rule but few wills would be able to stand the test where an unequal distribution of property has been made by a testator among children. A man has a right to dispose of his property by will in such manner as he may desire, and the fact that he may give more to one child than another does not affect the validity of a will or prove that the testator is incompetent to make a will."

An absolutely sound mind is not necessary in order that a testator may have testamentary capacity. (*Hutchinson* v. *Hutchinson,* 152 Ill. 347; *Bailey* v. *Oberlander,* 329 id. 568.) All that is required is that he have sufficient mental ability to know and remember who are the natural objects of his bounty, to comprehend the kind and character of his property and to make disposition of that property according to some plan formed in his mind. (*McLean* v. *Barnes,* 285 Ill. 203.) Eccentricity does not constitute unsoundness of mind. (*Estes* v. *Clark,* 317 Ill. 585.) The evidence clearly does show that Thompson was a well-to-do farmer, who possessed good business judgment—good enough, in fact, to abundantly take care of himself in the somewhat risky and entertaining pursuit of trading and buying livestock. Old age brings on peculiarities, but peculiarities are a long way from unsoundness of mind. There has been a total failure on the part of the contestants to overcome the presumption of sanity and a consequent failure to turn a material allegation of their bill into a fact.

The record is silent as to evidence showing that Flossie Felgenhauer exercised any undue influence over Thompson, let alone undue influence directly or inferentially connected with the execution of the will. No witness for the contestants has pointed out one act or utterance of Flossie that could be attributed to the exercise of undue influence as it is characterized by the allegations of the bill. For a circumstance to be undue influence it must be directly connected with the will, operative at the time the will was

made and directed toward procuring a will in favor of the person exercising the alleged influence and must be such as to destroy the freedom of the testator's action. (*Goff v. Gerhart,* 316 Ill. 513.) The record is equally silent as to what fraudulent representations Flossie made to the testator, and fails to offer any proof in support of the allegations of the bill in that respect. No witness testified to one fraudulent representation, nor can one be created by inference from the evidence. Inasmuch as the contestants failed to prove the allegation that Flossie ever represented to Thompson, either honestly or fraudulently, that her father was by his will cutting her out of any share of the paternal estate, the contestants could not be allowed to introduce in evidence the will of Leonard or the recital of his business deals with his son-in-law in order to show the falsity of those representations. Non-existent representations could not be proved fraudulent or without basis.

The contestants also say that witnesses who state no facts or circumstances on which an opinion could reasonably be based should not be allowed to give their opinions of the testator's mental capacity. That is the rule. (*Hettick v. Searcy,* 278 Ill. 116; *Baddeley v. Watkins,* 293 id. 394.) It must be observed that this rule, when applied to a case of this character, operates as a two-edged sword, cutting down witnesses for the contestants as well as for the proponents. Witness Hawk, the only one for the contestants who said Thompson was of unsound mind, based his opinion upon a vague background of facts. The operation of the rule of law invoked weakens the case of the contestants to the point of having introduced no evidence whatever of the unsoundness of Thompson's mind.

For the reasons given above the decree of the circuit court of Lake county in dismissing the contestants' bill for want of equity is affirmed. *Decree affirmed.*