MARJORIE BEYERS, Plaintiff-Appellee, *v.* GENE BILLINGSLEY *et al.*,
Defendants-Appellants.

Third District No. 77-117

Opinion filed November 7, 1977.—Rehearing denied December 5, 1977.

Roger V. Pierson and Matthew A. Maloney, both of Princeton, for appellants.

William E. Stewart, of Kewanee, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Defendants, who are legatees, trustee and executor, appeal from denial of their post-trial motion after a general verdict of the jury rendered in Henry County declaring invalid the last will and testament of Frank A. Beyers executed on September 14, 1972. He died February 17, 1975. That will (hereinafter referred to as the September 1972 will or third will) had been admitted to probate and letters testamentary issued thereon to one of the defendants, Robert V. Fuhr.

The plaintiff, daughter of the deceased, and her descendants were disinherited under the September 1972 will. She challenged the validity of the will on these distinct theories: (1) that the testator lacked testamentary capacity at the execution of the will; and (2) that three of the defendants (Gene, Bobby Joe and James Billingsley) exerted undue and wrongful influence upon testator and thereby procured a will which was not the free and voluntary act of the testator.

Defendants have raised several issues in their brief in regard to evidentiary, procedural and substantive rulings of the trial court. First to be considered in this appeal is the trial court's refusal to grant defendants' motion for new trial based on an alleged false statement of the plaintiff.

In rebuttal at the jury trial plaintiff testified her brother William (decedent's son) did not complete any schooling; and that contrary to attorney Rumley's testimony that her father had told him the son had been in an automobile accident, she testified that her brother had been born with an enlarged head and had been retarded since birth. This testimony went to the issue of the soundness of testator's memory as it related to testamentary capacity. In support of the motion for new trial defendants produced a certificate by the Regional Superintendent of Schools that both plaintiff and her brother were issued diplomas and attended the same school in 1936-37.

██ This court notes that in both the September 1972 and March 10, 1972, wills, the testator provided an $80,000 life estate in trust for this son. Defendants could have shown the falsity of the assertions in regard to the son at the jury trial, if indeed they were false or of such a nature to impugn the veracity of plaintiff. The cause and true condition of the son of decedent was factual information available to both parties; his receipt of a diploma does not change that condition nor necessarily make plaintiff's statement false. Had defendants challenged the truth of the cause of the retarded condition, defendants' motion for new trial based on false testimony would have had sufficient merit because it would be false testimony of such nature as would probably change the result in a retrial. We affirm the trial court's denial of the request for new trial based on asserted false testimony. *Kaster v. Wildermuth* (1969), 108 Ill. App. 2d 288, 247 N.E.2d 431.

██ Plaintiff contends that this appeal must be dismissed as the appeal is based on the order disposing of the post-trial motion, which orders have been treated as non-final and therefore not subject to appeal. (See Supreme Court Rules 301 and 303, Ill. Rev. Stat. 1975, ch. 110A, pars. 301, 303.) Here, however, once the trial court refused to set aside the verdict on a timely post-trial motion and refused to grant a new trial, there was nothing left for the trial court to do but execute the judgment in regard to the September 1972 will. The order denying all relief requested in the motion assumed the necessary qualities of finality as it disposed of defendants' legacies under that will and terminated litigation as to that will. Furthermore, the order determined rights and status of the trustee and executor named in the September 1972 will, parties to this proceeding, which would bring this appeal within the purview of Supreme Court Rule 304(b) (Ill. Rev. Stat. 1975, ch. 110A, par. 304(b)).

██ Defendant contends that three of plaintiff's tendered jury instructions were erroneously accepted and given by the trial court. One is IPI Civil No. 1.03, circumstantial evidence instruction. Since both parties presented circumstantial evidence to the jury, we find no reason to exclude the instruction. Pertinent circumstantial evidence consisted of decedent's living arrangements, when and how those arrangements came into existence and terminated, decedent's manifest physical and mental conduct at various times, his customary manner of transacting business, who were the natural objects of his bounty, who were the actual objects of the September 1972 will.

██ The other two instructions are IPI Civil No. 200.01 and IPI Civil No. 200.03, which this court considered in *Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 361 N.E.2d 134. We reiterate that IPI Civil No. 200.01 was intended to state, without emphasis, the issues actually presented in the particular will contest and hold that IPI

Civil No. 200.01, as tendered here, did so using the issue language as suggested in the explanatory notes in the Illinois Pattern Jury Instructions, Civil (2d ed. 1971).

■■■ We do not agree with defendants' contention that the general issue instruction must be omitted if evidence did not *prove* lack of testamentary mental capacity and show presence of undue influence. An issue instruction should be omitted only if no evidence going to that was ever presented by either party, except in cases where mandatory issues (*e.g.*, freedom from contributory negligence) must be found. Defendants' contention overlooks the whole purpose of letting an issue go to the jury, for if the evidence or lack thereof on an issue is overwhelmingly in favor of a movant, the trial judge should entertain a motion for directed verdict on that issue. Evidence of decedent's mental capacity and influence factors was presented. Where reasonable men can differ as to the conclusion[s] to be drawn from the evidence on an issue, that issue should be submitted to the jury. (*Peters v. Catt* (1958), 15 Ill. 2d 255, 154 N.E.2d 280.) We hold that reasonable men could disagree as to the conclusions to be drawn from the evidence on both issues going to the validity of the September 1972 will of Frank A. Beyers, and that instructing the jury as to both issues was proper. It was for the jury to decide whether the mental capacity was sufficient for testamentary purposes and whether there existed influence that was undue whereby the disputed will was procured.

The function of IPI Civil No. 200.03 is to instruct the jury on the manner in which undue influence may be proven. The instruction given was properly worded, precisely following IPI Civil No. 200.03.

We believe that some confusion was caused by the use of conjunctive words in the instruction on issues, which caused conflict with another instruction that plaintiff need only prove one issue. Twice the jury summoned the judge back to the courtroom. The confusion in these instructions was potentially damaging to plaintiff, and defendants have asserted that the trial judge acted improperly in giving a further instruction to the jury. Defendants cite section 67(1) of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 67(1)), requiring written clarification unless the parties agree otherwise. The record does not show the presence or absence of counsel at the jury inquiries, but this court does have the record of the rebutted presumption clarification and finds it within the spirit of the statute.

■■ The trial judge did not change the instructions, he encouraged the jurors to reread all instructions, and was as concretely accurate as he could be within the confines of the pattern instructions. This court is cognizant of the common practice to give one copy of the instructions, one per page, unnumbered, to be shared by a jury, after having them read aloud by the court. We hold that where the record shows the jury had

legitimate questions and the judge's responses thereto were not unwarranted, were not contrary to law and were not such as to indicate the judge's conclusions of the evidence (here, undue influence), and where they did not unduly emphasize certain instructions to the exclusion of other instructions, then reversible error was not committed by the trial court.

■■ ■ At the close of plaintiff's case in chief and at the close of defendants' case in chief, defendants moved for directed verdict in their favor. The trial court twice denied the motion and applied the standard of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. It has long been the law of this state that will contests are subject to the same standard for directed verdict and judgments *n.o.v.* as are other civil cases. Defendants' citation and reliance on other standards is misplaced, as *Pedrick* was intended to settle for all civil cases one standard for direction of verdicts and to forever bury the plethora of standards formerly in use.

> "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant [here, defendants] that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513.

The plaintiff called as witnesses: the administrator of a nursing home which decedent disliked and left, traveling some distance to arrive at Bobby Joe Billingsley's doorstep; the plaintiff, Marjorie Beyers, whose testimony was limited to heirship due to dead man's statute exclusion of her testimony as the result of her interest in the outcome of the trial; Bobby Joe Billingsley, who testified under section 60 of the Civil Practice Act and who took care of decedent for three to four months in 1972 and at whose home the will was signed within approximately one hour after plaintiff relinquished her conservatorship over her father in favor of Walker Lloyd; Robert V. Fuhr (trustee and executor under the disputed will), and who was to receive $5,000, was one-third remainderman of the trust and one-third residuary legatee under the disputed will; Walter Gene Billingsley, also called under section 60, at whose home decedent also lived for some months in 1972, being paid $200 per month by the conservators, and who was to receive from the will the same as witness Bobby Joe Billingsley; and Hans Lassman, friend and boarder of plaintiff who knew and observed decedent from 1968 to 1972 and who testified that he occupied a separate portion of plaintiff's house.

Plaintiff's exhibits included: an order dated May 5, 1972, creating conservatorship of Frank A. Beyers, plaintiff as conservator, and the will in question dated September 14, 1972. The will of March 10, 1972, was

offered into evidence but excluded at that time for lack of basis or foundation.

■■ After listening to argument of both counsel directed to defendants' motion for directed verdict, jury excluded, the trial judge summed the evidence viewed in its aspect most favorable to the opponent thus:

"There are two questions raised in the pleadings as I read the pleadings. First is whether he had mental capacity and secondly is whether there is undue influence. On the question of mental capacity the Court feels there's evidence that the jury could conclude, could draw inferences from that he lacked mental capacity. Among the things I have heard from the evidence is that there is a judicial finding he was incapable of managing his own affairs. There's evidence that he would not take care of his health, such as he wouldn't feed himself, he wouldn't even go to meals when they were prepared for him all the time. He wouldn't bathe. He would urinate virtually anywhere. He urinated in the bank, sandbox, on the dishes in the sink and faces of his grandchildren who apparently are supposed to be objects of his bounty. One of the tests is (that) he should know the objects of his bounty. There's no reason given in the evidence why he would do this, if he was a sane man. We have got further evidence he would smear feces over walls. He thought everybody was a crook. He didn't trust anybody. Nobody could tell him what to do unless he wanted to, he leaves his estate to a pair of strangers, he throws his mail around, there's apparently evidence that there was mail found in the evergreens, left in the car, stepped on. The mail included not only bills but checks which would indicate he did not understand the extent of this property, the value of checks. So, I am going to deny the motion for directed verdict at this point in time. * * *"

Such summarization of the evidence clearly illustrates that the trial judge was correct in denying defendants' motion for directed verdict and the end of plaintiff's case in chief.

Defendants proceeded with their case, first calling Robert V. Fuhr (trustee and executor under the third will). He testified that he is a banker-merchant, had been acquainted with decedent for many years, and was allowed to give an opinion as to the mind and memory of his ward. The record reveals a vague time frame and vague comments on cross-examination.

Defendants' next witness was Donald D. Rumley, attorney, draftsman and witness to three wills executed by decedent from 1971 through 1972. In general terms he testified to decedent's assertions as to the nature of his property; a belief that decedent held as to a "relationship" between

plaintiff and Hans Lassman; decedent's concern over the drinking and dating habits of Bobby Joe Billingsley who was recently divorced; decedent's statement that his son was incompetent due to a car accident during his late teens; decedent's statements as to the number of children of his daughter and granddaughter; the changes back and forth in the three wills. Rumley testified without objection that decedent was of sound mind and disposing memory on September 14, 1972, based upon his dealings with the man since 1971, and his conclusions as to the lack of evidence of undue influence or pressure brought to bear upon Beyers to sign the third will.

Rumley also testified to decedent's determination to remove plaintiff as his conservator. Rumley is the attorney who helped Beyers get his daughter, the plaintiff, removed after considerable negotiation with her attorneys in the conservatorship primarily involving settlement due her from another estate. Rumley's impression of the decedent's reason for removing plaintiff from the trustee and executor position of the March 10, 1972, will was his strong disapproval of the relationship he felt existed between her and Lassman.

The first will was never produced, but Rumley testified that it contained large bequests to the three Billingsleys (late 1971); the second will reduced the Billingsley bequests to $1,000 each and made plaintiff trustee and executor; the third will increased the Billingsley bequests to $5,000 each, made them the trust remaindermen and residuary legatees to the absolute exclusion of plaintiff and her descendants. The one area that never changed was an $80,000 life estate in trust for the son.

For three weeks preceding the conservator change the decedent discussed provisions for the third will with Rumley. During this period of time Rumley became aware of "other legal problems between the decedent and his daughter" which apparently arose from decedent's administration of the Ellen Beyers estate which had been open for 19 years and out of which "there was a good chance of some liability of Frank's part." The decedent had agreed that a disposition from that estate to his daughter was rightful and Rumley testified that "we were quite willing to wind up those affairs and Marjorie [plaintiff] gave Frank a release."

Rumley did not ask decedent to make an independent list of his property; he did verify the conservatorship inventory filed by Marjorie Beyers with decedent. That inventory was valued at $150,000 in 1972; at trial time (November 16, 1976) there was not enough to pay the $15,000 Billingsley bequests and fully fund the $80,000 trust for the son.

On cross-examination Rumley testified that Bobby Joe Billingsley inquired about his doing some work for the decedent in regard to the

conservatorship and the will. The will was signed and witnessed at the Billingsley residence by a prearranged appointment for September 14, 1972. Rumley did not recall whether Frank Beyers was in court earlier that day when the order changing conservators was entered. The other witness to the will was Rumley's new associate lawyer. Bobby Joe Billingsley was present in the living room during the first reading of the will to the decedent, after which only Rumley, his associate and decedent went to another room out of sight and hearing of Billingsley and sat at an eating table where Rumley briefly discussed the will again and inquired about any further changes desired. Rumley also asked decedent whether anybody was forcing or requiring him to do this and decedent replied there wasn't.

Other witnesses called by defendants were:

1. Robert Hayden, stock broker, who testified to a long-term business relationship with decedent and with whom decedent initiated a conference in early 1972 about changing his investment program from common stock to municipal bonds as being safer and more appropriate for his age; that over the years decedent's usual dress was overalls and a hat. He subsequently saw decedent walking along the street one time in the fall of 1974, recognizing him by his dress, and that decedent did call him by name after the witness caught his attention.

2. Cecil Newman, a long-time friend of decedent, who used to share private airplane trips and who saw decedent several times in 1971 to 1973. It was his further testimony that in March 1973, at decedent's request and after obtaining funds from the bank, they took a 13-day trip to Texas during which decedent never appeared to be confused, and that he followed his usual pattern of conserving money by patronizing inexpensive restaurants, wearing overalls and insisting on driving nonstop to their destination. The witness also testified that decedent discussed his daughter and became very angry as he recalled discovering everything had been taken out of his hands. On cross-examination the witness related that the sum of $500 which decedent had with him became lost or stolen. Decedent told him of being robbed on an earlier trip to Texas. In 1973 the witness felt Frank Beyers was of sound mind.

3. Jean Newman, wife of Cecil Newman, testified that she also saw decedent occasionally in 1971 through 1973. She never recalled the decedent complaining about his daughter, discussing his property, grandchild or great grandchildren. Her testimony was to the effect that when she saw decedent in 1971 to 1973 he had acted in his usual manner, never seemed confused, had stayed overnight for the Texas trip (1973) and did not cause any problem related to his urinating.

4. Michael Massie, the lawyer who was the other witness to the third

will, was also present at the courthouse with attorney Rumley and the decedent earlier that day. He testified that he and the decedent sat in the courthouse hallway most of the time and conversed about the hearing, the 1972 presidential campaign, and that the decedent expressed the hope that Democrats would be elected because it would help the stock market; however, the witness knew nothing of the stock market and considered the comment funny. His recollection is that the will was read entirely while the decedent followed the wording contained in a copy. He recalls that after it was read the decedent wanted to know if Marjorie, the plaintiff, shouldn't be mentioned in the will and at least left $1. (Section V of the will states Marjorie's name four times, and the granddaughter, Mary, is named twice.) The witness Massie's impression was that on September 14, 1972, decedent was very bitter, angry and upset about his daughter's actions regarding the conservatorship, and he thought that she was trying to get his money and that was the only influencing factor the witness observed. The witness further stated he thought decedent might be eccentric, but that he knew what he was doing that day.

5. Carmella Anderson, while a bank employee last saw the decedent in May 1972, and she testified primarily to the time span 1968-1971 during which she handled bank and business transactions for him from one to three times a week. Her testimony pictures a man who acted as a gentleman, was generally clean, ordinarily wore overalls and hat, knew the approximate value of his stock holdings and dealt with the stock market frequently and always knew what he paid for the stock and at what price he was selling, always making a nice profit and encouraging her to make investments. She further stated that she did not notice anything unusual about his behavior in 1971 nor in May 1972.

Since the verdict was general, this court must discuss both grounds of the alleged invalidity of the September 14, 1972, will of the decedent, Frank A. Beyers.

■■ First, the ground of undue influence, which in general is influence exerted in connection with the execution of a will in which the dispository provisions are more the will of the influencer than the testator. The circumstances which raise a presumption that a will was executed as a result of undue influence on the testator, and if proved and unrebutted, are sufficient to void the will follow:

(1) a fiduciary relationship between testator and a person who receives a substantial benefit under the will (compared to other persons who have an equal claim to testator's bounty);

(2) a testator in a dependent situation in which the substantial beneficiaries are in dominant roles;

(3) a testator who reposed trust and confidence in such beneficiaries; and

(4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated. Once proved, a *prima facie* case of undue influence has been established. *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 234 N.E.2d 91; *Redmond v. Steele* (1955), 5 Ill. 2d 602, 126 N.E.2d 619; *Tidholm v. Tidholm* (1945), 391 Ill. 19, 62 N.E.2d 473.

The evidence supports findings that a fiduciary relationship between the decedent, Fuhr, Rumley and the Billingsleys did exist and the Billingsleys would eventually receive substantial wealth in excess of $100,000 under the September 1972 will, and Fuhr would be entitled to collect fees for services as conservator, trustee and executor; that the decedent was dependent on Billingsleys for food, shelter, care and companionship; they were in the dominant roles, they could sympathize and buttress testator's anger and indignation over his conservatorship; and that he chose to live with them and trusted them with his person and trusted Fuhr with his money; and that further the decedent was living with Bobby Joe Billingsley during the change of conservator and third will preparations, during which Bobby Joe Billingsley made the initial attorney contact for the third will and new conservator and provided frequent transportation to the attorney's office and that the appointment to sign the will was prearranged to take place in his home, and that Bobby Joe Billingsley was present for the reading of the will in his living room, and he also was present at the courthouse, and that the will was signed within an hour of the official change of conservators.

■■ Defendants had the burden to overcome the presumption of undue influence. (*Tidholm v. Tidholm* (1945), 391 Ill. 19, 62 N.E.2d 473; *Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 361 N.E.2d 134.) One Billingsley never testified and Gene Billingsley testified he did not know of the will until testator's death.

The jury was apparently not convinced by the testimony of Rumley and his then assistant that the will was the result of free deliberation on the part of the testator and of the deliberate exercise of sound mind and memory. *Tidholm v. Tidholm* (1945), 391 Ill. 19, 62 N.E.2d 473.

"The feebler the mind of the testator, the less evidence will be required to establish the existence of undue influence." *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 234 N.E.2d 91; *Peters v. Catt* (1958), 15 Ill. 2d 255, 154 N.E.2d 180; *Mitchell v. Van Scoyk* (1953), 1 Ill. 2d 172, 115 N.E.2d 226; *Lake v. Seiffert* (1951), 410 Ill. 444, 102 N.E.2d 294.

■■ ■ Lastly, we discuss the ground of lack of testamentary capacity. Testamentary capacity requires sufficient mental ability to know and remember who are the natural objects of his bounty, to comprehend the kind and character of his property and to make disposition of the property according to some plan formed in his mind.

(*Quellmalz v. First National Bank* (1959), 16 Ill. 2d 546, 158 N.E.2d 591; *Morecraft v. Felgenhauer* (1931), 346 Ill. 415, 178 N.E. 877.) Deliberate disinheritance of an heir does not establish inability to know the natural objects of testator's bounty. If only the will is considered, it does set forth who are the natural objects of the decedent's bounty. (*Ennis v. Illinois State Bank of Quincy* (1969), 111 Ill. App. 2d 71, 248 N.E.2d 534.) There is testimony that the decedent's memory had failed as it concerned his son.

The testamentary capacity of the decedent falls short primarily in the second requirement—comprehension of the kind and character of his property. Here, his actions spoke louder than the words of the third will. Plaintiff proved the testator's lack of comprehension of the kind and character of his property by the treatment of dividend checks and repeated loss of cash.

While the jury could find that there was some evidence to support a disposition according to testator's plan (the trust for the son in both wills), they might also consider defendants' testimony that it was Bobby Joe Billingsley who approached Rumley in regard to making a new will for Frank and changing conservators.

It has also been stated that if a person has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life, he has sufficient mental capacity to dispose of his property by will. *Shevlin v. Jackson* (1955), 5 Ill. 2d 43, 124 N.E.2d 895; *Quellmalz v. First National Bank* (1959), 16 Ill. 2d 546, 158 N.E.2d 591.

■■ While many persons testified to the mental soundness of decedent over the general period of time, the irrational behavior testified to in regard to urinating over the infant great grandchildren is conduct so outrageous that a jury could find it beyond eccentricity. In addition to urinating on dishes and in the kitchen sink, there was the obsessive dislike for the daughter founded on a questionable belief and the reality of Rumley's admission that decedent owed the plaintiff something from Ellen Beyers' estate. There was sufficient evidence to uphold a jury determination that his behavior was not mere eccentricity or long-established peculiarity. (*Quellmalz v. First National Bank* (1959), 16 Ill. 2d 546, 158 N.E.2d 591; *Malone v. Malone* (1960), 26 Ill. App. 2d 291, 167 N.E.2d 703.) In fact, the testimony established that this conduct was so far out of keeping with the earlier established character of the decedent that reasonable men could conclude that by September 1972 his mental ability had suffered great impairment to the point where he was incapable of understanding the business of making his will. Moreover, those who testified as to his mental capacity on the date in issue had known the decedent for less than a year in one instance, and less than a day in the other.

The order of the trial court denying that post-trial relief requested is affirmed, and the jury verdict finding the will of Frank A. Beyers executed on September 14, 1972, invalid is affirmed.

Affirmed.

STENGEL, P. J., and STOUDER, J., concur.