In re ESTATE OF HELEN A. WRIGLEY, Deceased.—(JOAN FISCHER WRIGLEY, Plaintiff-Appellee, v. WILLIAM WRIGLEY, Ex'r of the Will of Helen A. Wrigley, et al., Defendants-Appellants.)

First District (2nd Division)    Nos. 81-165, 81-290 cons.

Opinion filed March 9, 1982.

Barnard & Barnard, of Chicago (Morton John Barnard, of counsel), for appellants.

Jenner & Block, of Chicago (Michael J. Rovell, Donna Helen Triptow, and Gail Niemann, of counsel), for appellee.

JUSTICE DOWNING delivered the opinion of the court:

These appeals, consolidated for decision by this court, arise from a will contest filed by plaintiff Joan Fischer Wrigley (Joan). The proceedings involve disposition of certain specific items alleged to be part of the estate of decedent Helen A. Wrigley (decedent). In her petition to contest the will, Joan sought (1) to have a codicil to decedent's will declared null and void due to decedent's alleged lack of testamentary capacity (count I); and (2) to have *inter vivos* gifts, purportedly made by decedent to defendants Dorothy W. Chauncey (Dorothy) and Helen Rich Holmes (Helen) from decedent's estate, set aside due to decedent's alleged lack of donative intent (count III).[1] The trial court granted defendants' motion to

sever for trial counts I and III. Thereafter, the claims proceeded separately. Count I gave rise to appeal No. 81-165; count III gave rise to appeal No. 81-290. We will discuss each proceeding separately, after the following brief preliminary recitation of the underlying facts of the two actions.

On March 5, 1975, decedent executed a will. (There is no dispute concerning her testamentary capacity at that time.) In the will, she bequeathed three items of jewelry (a diamond brooch, a gold wristwatch, and a pair of earrings) to her then daughter-in-law, Joan. Some six months after executing this will, on September 18, 1975, decedent suffered a stroke. During her convalescence, in late February 1976, decedent was informed that her son, defendant William Wrigley (William), was having marital problems with his wife, Joan. On April 21, 1976, decedent purportedly executed a codicil to her will which specifically and solely deleted from the will the gifts of jewelry to Joan.

In December 1976, the jewelry was given to Dorothy (the brooch and wristwatch) and Helen (the earrings), purportedly as a gift from decedent. This transfer apparently occurred in Chicago. Both Dorothy and Helen took the jewelry back to their State of residence, Arizona.

On June 27, 1977, decedent died. Her will and the codicil were admitted to probate in Illinois. William, the executor of the estate, filed an inventory of decedent's Illinois property with the court. The inventory did not list the three pieces of jewelry. On January 13, 1978, Joan filed the initial pleading which eventually resulted in these appeals.[1]

## No. 81-165

After the trial court granted the defendants' motion to sever counts I and III for trial, which order was not thereafter objected to by Joan, count I (the codicil contest) proceeded to a jury trial. At the close of Joan's case in chief, William made a motion for a directed verdict, which was denied. The jury eventually returned a verdict for Joan. William filed a motion for judgment notwithstanding the verdict (*n.o.v.*) and, alternatively, a motion for new trial based on several alleged errors in evidentiary rulings by the trial court. Both motions were denied.

In appealing the outcome of count I, William contends the trial court erred (1) in failing to grant his motion for judgment *n.o.v.*, and (2) in failing to grant his motion for a new trial. In light of the nature of these contentions, a lengthy recitation of the evidence is necessary.

W. Stirling Maxwell was called by Joan as a section 60 witness (Ill. Rev. Stat. 1979, ch. 110, par. 60), over William's objection. Maxwell had

---

[1] Joan also sought to have the codicil declared void (count II) and the gifts set aside (count IV) on the ground of the alleged undue influence of decedent's son, William Wrigley. These counts were dismissed and are not relevant to this appeal.

served as the Wrigley family lawyer since 1950, and since 1975 had devoted nearly all his time to Wrigley matters.

He had drafted decedent's will of 1975. In February 1976, Maxwell learned that Joan had filed suit against William, seeking to set aside an antenuptial agreement. Maxwell called upon decedent in Lake Geneva, Wisconsin, where she was convalescing from the stroke she had suffered in September 1975. Maxwell mentioned Joan's suit to decedent and asked whether she desired to eliminate the bequest to Joan from her will. Since decedent was basically unable to speak as a result of the stroke, she had not initiated the conversation. In response to Maxwell's query, decedent only nodded her head and uttered "a rather low noise."

On April 21, 1976, Maxwell brought the codicil at issue here to decedent at Lake Geneva. On the signature line, Maxwell printed decedent's name prior to her making her "mark" on the document.

The following is the signature on the codicil:

"IN WITNESS WHEREOF, I have hereunto subscribed
my name and affixed my seal this 21st day of
April, 1976.
[Decedent's "mark"]---- N E I N N Π Π N N N Λ
[Maxwell's printing]---- HELEN A. WRIGLEY [SEAL]."

Joan appeared as a witness on her own behalf. After decedent's stroke, while Joan was still living with William as his wife, she had discussed decedent's condition with him on several occasions. William first told Joan about the stroke about one week after it occurred. He related there had been some damage physically, but no one really knew the extent at that time. William asked Joan to keep the matter secret because decedent would not have wanted anyone to know her health status. At a later conversation, William told Joan that it was heartbreaking to watch decedent. She was making a sound similar to his sister's name (Dee Dee) "in her frustration to communicate and try to make herself understood."

On another occasion, William related that he was exhausted. Decedent had been agitated and screaming. They had tried everything to quiet her. She finally stopped screaming when the television was turned off, although William was not sure if she had stopped for that reason or because she had tired. About one month later, William told Joan he was frustrated at not being able to help decedent. They would ask decedent a question, and the manner in which she nodded her head (yes or no) did not correlate to her later reaction to their compliance with that response. At the hearing, William objected to introduction of Joan's testimony. On cross-examination, Joan stated she did not see decedent again after Christmas Day 1975. (We note that all of the conversations to which Joan

testified occurred several months prior to decedent's purported execution of the codicil.)

William was called as a section 60 witness. Decedent had been hospitalized as a result of her stroke. He saw no change in her ability to communicate from September 1975 until her death. Decedent never related to him in any manner that she had deleted Joan from her will.

Ann Jugenheimer, an occuptional therapist, testified for Joan. She became employed at the Rehabilitation Institute of Chicago (RIC) in April 1976. Her duties were to evaluate patients and plan treatment programs. While at RIC, she began treating decedent on July 15, 1976. (We note this is nearly three months after the purported execution of the codicil.) Jugenheimer saw decedent on a daily (weekday) basis for about 45 minutes per session. Occasionally, when observing decedent eating, she would see decedent eat with her fingers, although she also used a spoon or fork. She once saw decedent stir coffee with a knife. Jugenheimer believed decedent once mistook a hairbrush for a toothbrush, since decedent was bringing it toward her mouth.

Jugenheimer performed tests on decedent with blocks. She would put them in a pattern and ask decedent to duplicate it. Decedent could do very simple designs but had difficulty with others. Decedent was also unable to consistently match identical pictures of people, although she could do· some of them. Decedent never initiated any communication with Jugenheimer. At one point, therapy had to be done in decedent's room because decedent made too much noise in the clinic, disturbing others by continually repeating "dee dee."

On cross-examination, Jugenheimer stated she had no opinion as to decedent's physical or mental condition in April through June 1976. On redirect, Jugenheimer related that based upon her observations, decedent could not understand the nature and extent of her property in July and August 1976. Joan rested her case at the close of Jugenheimer's testimony.

W. Stirling Maxwell appeared again to testify, this time on behalf of William. Prior to the stroke, decedent had a very keen mind. He first saw decedent after the stroke in October 1975 in Chicago. She recognized Maxwell, squeezing his hand and smiling. Decedent communicated with Maxwell through facial expressions and movement of her left hand. Decedent could no longer sign her name in a normal fashion, but could "make a mark." In their next meeting a few weeks later, Maxwell asked decedent if she wished to be a trustee of a trust being established by her husband. Decedent nodded "and otherwise indicated that she did." Maxwell suggested someone be assigned to help with the paperwork. He first named her husband, but decedent shook her head from side to side. When Maxwell mentioned her former son-in-law (William J. Hagenah, Jr.), she indicated "yes."

Maxwell stated that decedent recognized him on each visit he made in the ensuing months. She was able to feed herself with her left hand and drink without assistance. On one visit in early 1976, Maxwell informed decedent of Joan's suit against William. Decedent's expression showed interest. When Maxwell suggested decedent might want to change her will, she nodded and made slight motions of the body. When asked if she wanted to eliminate the bequest to Joan, she responded with a smile. Maxwell asked if she wished to leave anything to Joan. Decedent shook her head from side to side.

Maxwell further testified that on the date the codicil was executed, he was accompanied to Lake Geneva by Claude Brooks. Brooks showed decedent pictures of wind damage to the Wrigleys' Catalina Island Company property in California. Decedent responded "no, no, no" when Brooks stated that decedent had not previously seen the damage, since she had been there earlier. As to the codicil, Maxwell printed decedent's name on the codicil, after which she made marks above it. Maxwell asked her if the document was to be a codicil to her will; decedent indicated in the affirmative with motions and by nodding. She indicated her approval to Maxwell and Brooks serving as witnesses. In Maxwell's opinion, decedent had the ability to understand the nature and extent of her property, to know the natural objects of her bounty, and to understand the codicil.

William appeared on his own behalf. Prior to the stroke, decedent maintained a "somewhat uncomfortable relationship" with Joan, and was in good mental health. As a result of the stroke, decedent lost her ability to speak and suffered paralysis of her right arm and leg. Decedent recognized family members, as shown by facial expressions. She could say "Dee Dee" (her daugher's name), "yes," "no," and occasionally "Bill." She also communicated by gesturing with her left hand, shaking her head, and using a "very readable facial expression." William was satisfied that decedent undertood statements he made to her. She was aware of her condition. On one occasion, decedent pointed to a picture of William's grandfather, who had suffered a stroke and loss of speech, and then pointed to herself. William believed decedent understood what she watched on television, responding appropriately to what was being shown. On several occasions, decedent indicated her ability to recognize her property by signaling that she wanted something done or placed in its proper position. William believed decedent recognized the extent of her property, the natural objects of her bounty, and the effect of signing the codicil.

Dr. Jacob Suker, a physician, knew decedent as a patient and friend. The family called him when decedent first showed symptoms of having suffered a stroke. When decedent's condition stabilized, she had paralysis

of her right arm and leg, had lost vision in the right half of each eye, and was unable to speak. Suker diagnosed expressive aphasia, which he described as loss of the ability to either read, write, or make gestures. Expressive aphasia did not affect her intellect. Suker was able to communicate with decedent after the stroke. She recognized family members.

Suker visited decedent at Lake Geneva on April 21, 1976. She recognized him. Decedent had no change in her mental condition, and remained able to communicate through facial expressions. Suker believed decedent was aware of the natural objects of her bounty, the nature of her property, and the effect of the codicil on that date.

On cross-examination, Suker stated he did not recall decedent's use of the word "dee dee." He had noted on a doctor's report in July 1976, that there was "a possibility of a probable partial receptive aphasia." (Receptive aphasia is the inability to read or understand.) Another doctor had informed Suker there was evidence of receptive aphasia in September 1975. On redirect, Suker stated he observed no indication in decedent's physical makeup that she suffered from receptive aphasia.

Dr. Donald Harter, a neurologist, examined decedent at Suker's request on September 18, 1975. He diagnosed a stroke, finding decedent had prominently expressive aphasia. Harter did not believe decedent's intellect was affected. She was able to communicate through gestures, facial expression, and changes in intonations of sounds she made. On cross-examination, Harter admitted an October 1975 report he made indicated that decedent suffered from some "receptive apratic elements of aphasia." On redirect, Harter noted that "apratic elements" prevent an individual from doing certain motor acts, but have nothing to do with one's ability to comprehend the spoken word.

The testimony of six other witnesses was presented by William as part of his case in chief. Because that evidence is essentially the same for the purposes of this appeal, we shall condense it here. Nancy Olsen served as a domestic to decedent through June 1976, and as a nurse's aide until decedent's death. Anita Pody served as a licensed practical nurse to decedent from October 1975 to decedent's death. Sarah Armstrong served as a licensed practical nurse to decedent from October 1975 to December 1975. Royal West was decedent's physical therapist from September to November 1975, and from March to July 1976. Veneta Lentz served as a secretary to decedent following the stroke. William J. Hagenah III was decedent's grandson.

Given the time frames in which they were familiar with decedent, each witness stated that decedent was capable of recognizing the extent of her property, the natural objects of her bounty, and the effect of a codicil. Several stated decedent could understand television shows. Most noted decedent's capacity to recognize visitors.

On rebuttal, Joan testified that Dr. Suker told her decedent's condition was "like a short circuit. You can't tell what's going in because you don't get what's coming out."

Patricia Gregor, a registered nurse at RIC, was also called as a rebuttal witness.[2] The only substance in her testimony came on cross-examination. Gregor stated decedent could recognize her family, could communicate by gesture, and could understand instructions. Gregor believed decedent could recognize the extent of her property and the natural objects of her bounty in July 1976.[3]

At the close of the evidence, the jury returned a verdict for Joan, finding decedent lacked testamentary capacity on the date she purportedly executed the codicil to her will.

I

Initially, we must address Joan's argument that appeal No. 81-165 should be dismissed. Joan asserts that the judgment in the codicil contest is not final because there allegedly remain issues other than the mere execution of that judgment. Consequently, she argues, appeal cannot proceed under Supreme Court Rule 301 (73 Ill. 2d R. 301). Additionally, Joan states that the appeal cannot be brought under Supreme Court Rule 304 (73 Ill. 2d R. 304).

■■ We reject Joan's argument and will reach the merits of appeal No. 81-165. First, we believe that this appeal was properly brought under Rule 301. Count I of Joan's petition (appeal No. 81-165), the codicil contest, was a statutory action based on section 8—1 of the Probate Act of 1975 (Ill. Rev. Stat. 1977, ch. 110½, par. 8—1). The evidence focused upon decedent's testamentary capacity in April 1976. The case was tried before a jury. Count III (appeal No. 81-290), the action to set aside the gifts of jewelry to Dorothy and Helen, is an equitable action. The evidence will focus upon decedent's donative intent in December 1976. The case will be tried without a jury. Causes of action are considered the same where the same evidence would sustain both. (*Mendelson v. Lillard* (1980), 83 Ill. App. 3d 1088, 1094-95, 404 N.E.2d 964.) This is not the situation here. Counts I and III state distinct causes of action. It is apparent, then, that the trial court correctly severed the two counts for trial. Once this severance was ordered, the practical effect was the creation of two distinct cases.

---

[2] William also called Mrs. William Bell (a friend of decedent) and Claude Brooks (a business acquaintance). On rebuttal, Joan also called the custodians of the medical records at the two institutions at which decedent was treated. None of their testimony is deemed relevant to disposition of this appeal.

[3] We note that William's brief contains a lengthy recitation of the substance of several offers of proof made at trial, and that his argument relies upon facts contained therein. We wish it clear that none of that material has entered into our consideration in disposing of this appeal.

The judgment on count I was final as to that case.[4] We find Rule 301 applicable to this circumstance to serve as the basis for an appeal from that judgment. See *Salyers v. Board of Governors* (1979), 69 Ill. App. 3d 356, 358, 387 N.E.2d 1129, *appeal denied* (1979), 79 Ill. 2d 618.

■■ Additionally, were appeal from the judgment on count I not appealable under Rule 301, appeal would lie under Rule 304(b). Under that rule, appeal may be taken from a final judgment as to fewer than all claims in a proceeding involving the administration of the estate when that judgment finally determines the right or status of a party. (73 Ill. 2d R. 304(b)(1).) As noted above, Joan's petition sought (1) to have the codicil voided, which would restore Joan to the position of a legatee in decedent's will, and (2) to have the gifts set aside, which would negate the ademption thereof and allow Joan to receive the bequest granted her in the will. While success in the second claim would be *legally* meaningless were Joan to fail on the first claim, the converse of that proposition is not true. Failure to succeed on the second claim, while rendering success on the first claim of no *practical* effect, would leave intact the *legal* effect of successful prosecution of the first claim, establishing Joan in the status of a legatee in the will. In other words, the judgment on count I, regardless of which party succeeds, will finally establish Joan's status in regard to the administration of decedent's estate. The count I judgment can be appealed under Rule 304(b)(1). See generally *In re Estate of Kime* (1981), 95 Ill. App. 3d 262, 419 N.E.2d 1246; *In re Estate of Wojtalewicz* (1981), 93 Ill. App. 3d 1061, 418 N.E.2d 418.

## II

William contends the trial court erred in denying his motion for judgment *n.o.v.*, filed after the jury returned a verdict in Joan's favor.

A judgment *n.o.v.* is properly entered only in those cases in which *all* of the evidence, when viewed in its aspect most favorable to the party opposing the motion for such judgment, so overwhelmingly favors the moving party that no contrary verdict based upon the evidence could ever stand. This is the oft-cited *Pedrick* standard. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) A will contest is subject to the *Pedrick* standard. (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 432, 369 N.E.2d 1320, *appeal denied* (1978), 71 Ill. 2d 597.) In examining the validity of a trial court's denial of a motion for judgment *n.o.v.*, this court will not consider conflicts in or the weight of the evidence, or the credibility of witnesses, as those are matters for jury con-

---

[4] The error in Joan's reasoning lies in her argument that the judgment in count I, even if affirmed, will not "entitle her to the jewelry." Joan misperceives the relief sought in count I. The sole relief available under that count would be the voiding of the codicil and the administration of decedent's estate under the original will alone. Her *right* to receive the jewelry lies outside of the scope of the relief sought in count I.

sideration. *Murray v. Kleen Leen, Inc.* (1976), 41 Ill. App. 3d 436, 440, 354 N.E.2d 415.

The factual issue in count I was whether decedent had the testamentary capacity to execute the codicil to her will on April 21, 1976. Testamentary capacity requires that the testator have sufficient *mental* ability to know and remember the natural objects of her bounty, to comprehend the kind and character of property held, and to make disposition thereof according to some plan formed in the testator's mind. (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 437-38.) The law presumes every person sane and of sound mind until the contrary is proved. The burden is on the party asserting the lack of testamentary capacity to prove such. (*In re Estate of Bonjean* (1980), 90 Ill. App. 3d 582, 584, 413 N.E.2d 205.) Evidence regarding a testator's testamentary capacity must relate to a reasonable period before, during, or after execution of the testamentary document. Such evidence is competent so long as it tends to show the testator's mental condition at the time of execution. *Trojack v. Hafliger* (1972), 7 Ill. App. 3d 495, 499, 288 N.E.2d 82, *appeal denied* (1973), 53 Ill. 2d 605.

■█ ■ We have carefully examined the lengthy record in appeal No. 81-165, and hold that the trial court erred in refusing William's motion for judgment *n.o.v.* We believe the evidence is wholly incapable of supporting a verdict for Joan. Briefly, no witness testified that he or she believed decedent was lacking in the elements of testamentary capacity in or near April 1976. While Joan's witness, Ann Jugenheimer, did reach such a conclusion, her familiarity with decedent's situation began on July 15, 1976, nearly three full months after the codicil was executed. Her testimony was not competent. (See *Trojack v. Hafliger.*) The remainder of the lay evidence either points to the conclusion that decedent possessed the requisite mental state (numerous witnesses gave their opinion that the elements of testamentary capacity were present in April 1976 when they were in a position to observe decedent), or is irrelevant to the issue (such as Joan's highlighting of the circumstances surrounding attorney Maxwell's possible undue influence upon decedent at the time of the codicil's execution). Nothing in the testimony of the doctors could support a verdict for Joan. In sum, we are convinced the record in this case could never support a valid judgment that decedent lacked testamentary capacity on April 21, 1976. Consequently, the trial court should have entered judgment *n.o.v.* for William.

III

In light of our determination above, we need not reach the merits of William's claim that the trial court erred in denying his motion for new trial, which motion was based largely on several alleged errors in ruling on

the admissibility of evidence. We do note that William also requested a new trial on the basis that the jury's verdict was against the manifest weight of the evidence. We have no doubt that William's position on this last point is valid. Had it been necessary to address this issue, this court would have reversed the judgment and remanded for a new trial due to the paucity of evidence supporting Joan's case.

Appeal No. 81-165 is reversed and judgment is entered for William that decedent's codicil was valid.

## No..81-290

The initial pleading filed by Joan on January 13, 1978, was concerned solely with the validity of the codicil. William filed a motion to strike that pleading, asserting Joan's claim was without merit because, *inter alia*, decedent had made a gift of the jewelry to Dorothy and Helen, rendering any success Joan might have in the action without practical effect. Dorothy and Helen filed affidavits in support of William's motion. On April 26, 1978, Joan amended the petition by adding counts III and IV, seeking the return of the jewelry from Dorothy and Helen. The latter filed separate special appearances to these counts, asserting that the trial court had no valid *in personam* jurisdiction over them nor valid *in rem* jurisdiction over the jewelry. After hearing oral argument, the court denied the special appearances. Dorothy and Helen appeared generally only as to counts I and II, and requested the trial court certify the jurisdiction question for permissive interlocutory appeal under Supreme Court Rule 308 (73 Ill. 2d R. 308). It did so, and we granted Dorothy's and Helen's application for such appeal, case No. 81-290.

## IV

Joan argues that Dorothy's and Helen's general appearances in the trial of case No. 81-165, count I, constituted a waiver of their objections to jurisdiction in this case. The theory underlying this argument is Joan's reiteration of her position in case No. 81-165 that the proceedings below consist of only one cause of action.

■■ Section 20(1) of the Civil Practice Act provides a special appearance may be made as to an entire proceeding or as to any cause of action involved therein. (Ill. Rev. Stat. 1979, ch. 110, par. 20(1).) We have previously ruled that there are two distinct causes of action involved here, found in counts I and III. Consequently, Dorothy and Helen could appear generally in the count I proceeding and maintain a special appearance under section 20(1) in the count III proceeding. We reject Joan's argument to the contrary.

## V

■■ Dorothy and Helen contend that the trial court lacked *in rem* jurisdiction over the jewelry in the count III proceeding. We note that the trial court never relied upon this jurisdictional basis below, nor does Joan assert this as a valid jurisdictional basis on appeal. A court cannot enter a judgment affecting title to property located beyond the territorial limits of the State in the absence of personal jurisdiction over a person who could be ordered to act upon the property. (See *Kramer v. McDonald's System, Inc.* (1978), 61 Ill. App. 3d 947, 959, 378 N.E.2d 522, *aff'd* (1979), 77 Ill. 2d 323, 396 N.E.2d 504.) A court may not grant relief as to property held by a nonresident who is not within the court's jurisdiction. (*Oakman v. Small* (1918), 282 Ill. 360, 364, 118 N.E. 775.) The jewelry sought by Joan is located in Arizona. In the absence of personal jurisdiction over Dorothy and Helen, the trial court could not enter judgment affecting title to the jewelry. We turn now to the question of personal jurisdiction.

## VI

Dorothy and Helen assert that the trial court did not have personal jurisdiction over them.

After hearing the parties' oral arguments on the question of the special appearances, the trial court ruled orally that the court did not lose jurisdiction merely because Dorothy and Helen took the jewelry out of Illinois. The court analogized the situation in the present case to those circumstances in which nonresidents learn of a relative's death, come to Illinois and "loot" the estate, and then leave Illinois for their home State. The court noted that it would not lose jurisdiction in such cases, and similarly here has not lost jurisdiction simply because Dorothy, Helen, and the jewelry are in Arizona. Based upon this reasoning, the court entered an order which stated in part that the court found "*in personam* jurisdiction as to the action to set aside gifts * * * under Section 17(1)(b) of the Civil Practice Act."

The long-arm statute provides that a person submits herself to the jurisdiction of the Illinois courts as to any cause of action arising from her conduct which consists, among other things, of the commission of a tortious act within Illinois. (Ill. Rev. Stat. 1979, ch. 110, par. 17(1)(b).) "Tortious acts" are not merely those which fall within the technical definition of a tort. A tortious act includes any act committed within Illinois which involves breach of a duty owed to another and makes the person committing the act liable to the other for damages. (*Poindexter v. Willis* (1967), 87 Ill. App. 2d 213, 217-18, 231 N.E.2d 1.) In order to find a factual basis for the assertion of personal jurisdiction based upon this segment of the long-arm statute, the court must look to those allegations of fact found

in the plaintiff's complaint. *First National Bank of Chicago v. Screen Gems, Inc.* (1976), 40 Ill. App. 3d 427, 433, 352 N.E.2d 285, *appeal denied* (1976), 64 Ill. 2d 595.

The following excerpts from count III of Joan's petition are central to resolution of the question of whether the trial court properly found personal jurisdiction over Dorothy and Helen based upon the tortious act segment of the long-arm statute:

"4. Defendant Chauncey [Dorothy] has asserted in an affidavit * * * that she received the jewelry * * * in December 1976, as gifts from the decedent.

5. Defendant Holmes [Helen] has asserted in an affidavit * * * that she received the jewelry * * * in December 1976, as a gift from the decedent.

6. At the time of the aforesaid purported gifts, decedent was over 75 years of age and was not of sound mind and memory; but on the contrary was in her dotage, was diseased in body, mind and memory, was wholly incapable of understanding or appreciating her relations to those who had a material claim upon her bounty, was incapable of making a just and proper inter vivos disposition of her property and did not have the mental capacity to make a good and valid gift. By reason thereof, the purported gifts to defendants Chauncey and Holmes were not the voluntary acts of decedent and are void and of no legal effect."

Joan's prayer for relief followed these allegations.

■■ Examination of these allegations demonstrates that Joan has failed to allege in the relevant portions of her petition any acts on the part of Dorothy or Helen which could conceivably fall within the scope of the long-arm statute's "tortious acts" provision. There is simply no claim made that either Dorothy or Helen ever owed any duty to Joan under the circumstances or engaged in any activity constituting a tortious breach of any duty which could satisfy the requisites of the long-arm statute and authorize the Illinois courts to assert jurisdiction over these nonresident defendants. Apparently, the trial court's error was premised upon its analogizing the present circumstances to those clearly different situations in which relatives of an already deceased person come in and "loot" the estate prior to its being probated in court. In such cases, the tortious acts are evident. Here, in contrast, nothing in the alleged acts of Dorothy or Helen is adequate for Illinois courts to assert personal jurisdiction over them. Nothing in Joan's arguments warrants a different conclusion. We reverse the trial court's finding of personal jurisdiction and remand for entry of an order granting the special appearances of Dorothy and Helen.

No. 81-165 reversed; No. 81-290 reversed and remanded with directions.

STAMOS, P. J., and PERLIN, J., concur.