*In re* ESTATE OF LUELLA KLINE, Deceased (Robert W. Kline, Petitioner-Appellant and Respondent, v. Johnny K. Kline, Ex'r of the Will of Luella Kline, Respondent-Appellee (Wendell E. Kline, Respondent; Wendell E. Kline, Petitioner-Appellant)).

Third District   No. 3—92—0223

Opinion filed May 19, 1993.

414

Timothy L. Bertschy, Karen L. Kendall, and Richard N. Molchan, all of Heyl, Royster, Voelker & Allen, of Peoria (Brad A. Elward, of counsel), for appellant Wendell E. Kline.

Hartzell, Glidden, Tucker & Hartzell, of Carthage (Stanley L. Tucker, of counsel), for appellant Robert Kline.

Chester J. Claudon and Thomas J. Homer, both of Claudon, Lloyd, Barnhart & Beal, Ltd., of Canton (Bruce Beal, of counsel), for appellee.

JUSTICE LYTTON delivered the opinion of the court:

Robert W. Kline (Robert) and Wendell E. Kline (Wendell) appeal by right from a judgment upon a verdict entered on June 24, 1991, by the McDonough County circuit court in favor of Johnny K. Kline (Johnny), as executor of Luella Kline's (Luella's) estate. Robert and

Wendell jointly raise the following issues for review: (1) whether the jury verdict finding the last will and codicil of their mother, Luella Kline, to be valid was against the manifest weight of the evidence; (2) whether the circuit court's ruling on the issue of Johnny's waiver of the protections of the Dead Man's Act (Ill. Rev. Stat. 1989, ch. 110, par. 8—201) was in error; (3) whether prejudicial error resulted from various rulings by the circuit court; and (4) whether the circuit court erred in its ruling denying one of petitioners' requested jury instructions. We affirm the circuit court on all issues.

Luella and Ernest Kline (Ernest) operated a large and successful farming operation near Macomb in McDonough County. Together Luella and Ernest had three sons, Johnny, Robert and Wendell. As the sons reached maturity, Johnny and Robert worked with Ernest farming their father's land while Wendell opened a produce store in Macomb.

In 1976, Johnny began living with Elsie Sue King (Sue) in a house located three-quarters of a mile from Luella and Ernest's home. Johnny rented this house from Ernest and Luella. Johnny and Sue were married in 1980. Between 1983 and the time of trial, they had separated numerous times, and at the time of trial, a divorce was pending.

Robert and Ernest jointly owned and operated a farm that was purchased in 1949. In addition to this farm, Robert helped Ernest farm a 160-acre parcel owned by Ernest. Originally, Ernest provided the farming machinery and Robert provided the labor. Robert worked in this relationship for approximately 20 to 25 years. In 1975, Robert purchased his own farming equipment and began tenant farming for Ernest. Later, Robert and Ernest became estranged from one another, after which they did not communicate, and all of their business affairs were conducted through Robert's wife, Mary.

In August 1982, Luella suffered a stroke which left her partially disabled, so that she required help with her daily personal needs. For many years before her stroke, Luella had very poor vision; she was blind in one eye, had severely impaired vision in the other and wore thick, heavy corrective lenses. Sue helped Luella with her personal needs such as dressing, bathing, going to the bathroom, cooking and cleaning. Immediately after Luella's stroke, she was confined to a wheelchair, but gradually was able to walk with the assistance of a walker, and then a cane.

In late November 1982, Sue and Johnny suggested that Ernest and Luella come to live with them. Ernest and Luella agreed, so long as Johnny and Sue promised not to place them in a nursing home.

Sue agreed to take care of them. According to Sue, Robert and Wendell had suggested nursing care for their parents, but Ernest and Luella were adamantly opposed. They moved in with Johnny and Sue without consulting Robert or Wendell.

According to the testimony of petitioners' witnesses, Luella's behavior began to change after her stroke. Specifically, Luella was observed laughing or crying for no apparent reason, talking or whispering to imaginary persons, talking to the dog as if it were a person, and undressing while watching TV. Luella would speak about being married to someone other than Ernest, about having a baby girl and having a miscarriage. This behavior was observed until the time of Luella's death. Sue testified that she would prepare Luella for anticipated conversations with people. Sue would tell Luella who the person was, what the weather was, and what day it was.

One of petitioners' witnesses, Cindy Teal, who used to date Johnny's son, testified that while she observed some unusual behavior from Luella, she also observed Luella carrying on normal conversations, including talking with Johnny about daily farming operations.

Ernest died intestate in March 1983. Sue testified that Johnny instructed her to sit next to Luella at the funeral so that if Luella talked to herself, it would appear that she was talking to Sue. During the funeral, Luella's sister, Pearl, came up to Luella. Luella did not believe that it was she because she believed Pearl was dead. On the night Ernest died, Mary asked Johnny to place Luella in a nursing home. Robert did not attend the funeral.

The day after Ernest's funeral, Sue called Wendell and asked him to come over to Johnny's house for a meeting. Robert was not called. Johnny, Sue, Luella, Wendell and his wife, Francis, attended the meeting. During the meeting, Johnny asked Wendell, "How do you want yours? Do you want it in land or money?" Wendell responded that the land should belong to Luella for her lifetime. Johnny asked Wendell if he would be willing to sign a paper to that effect. Wendell refused because, as he later testified, he did not trust Johnny. Johnny told Wendell that he wanted to keep the land together as long as possible as a tribute to Ernest, and that Johnny would farm the land and take care of it.

Sometime after Ernest's funeral, Johnny stopped by Robert's house and met Mary in the driveway. According to Mary, Johnny told her that Ernest had not left a will, and that "things would be different the next time around." Johnny denied making this statement.

Within three months after Ernest's death, Johnny was placed on Luella's joint checking account. Johnny sometimes wrote out checks

for Luella to sign, but generally, from 1983 until Luella's death, Johnny signed almost every check. Johnny took over the bookkeeping responsibilities of the farm from Luella.

While Ernest and Luella lived with Johnny and Sue, Robert's wife Mary called frequently on the telephone to talk with Luella. After Ernest died, when Mary called for Luella, she would be told that Luella was asleep, was in the bathroom, or generally unavailable. This continued for over a month until Mary gave up and stopped calling. Similar instances occurred when Wendell and Francis called or attempted to visit Luella after Ernest's death. Sue testified that Johnny instructed her to discourage Wendell and Francis from having contact with Luella.

On April 11, 1983, Johnny called and made an appointment for Luella with Chester J. Claudon (Claudon). Claudon is an attorney whose firm represented Johnny at trial in the instant litigation and on appeal. Luella and Johnny attended a meeting with Claudon on April 14, 1983.

According to Claudon's testimony, the April 14, 1983, meeting was a standard estate planning conference where the parties went over the assets of the estate and what course should be followed. Luella told Claudon that Johnny had managed the farm and handled the business affairs for Ernest and Luella, and that it was her desire that he continue. Luella nominated Johnny to act as administrator for Ernest's estate. An appointment to discuss the assets of Ernest's estate was set for April 22, 1983.

At the April 22 meeting with Johnny and Claudon, Luella indicated her desire to make a will. Johnny excused himself from the room, leaving Luella and Claudon alone. Luella told Claudon about the state of the families' relationships with one another, and indicated that she wanted each son to receive one-third of the estate, but wanted an arrangement where Johnny could farm the land for a period of time and the families would share in the income generated. Luella wanted Robert to be protected with a right to farm part of the land. Claudon suggested a testamentary trust. Luella wanted the trust to last 20 years, but Claudon recommended a 10-year term. Luella agreed to reduce the trust to 10 years.

Claudon drafted a will according to Luella's instructions. The will, in essence, provides that the two homes that she owned in Macomb, all personal property, securities in grain, and livestock were to be divided equally between Robert, Wendell and Johnny; the farmland was to be held in trust for 10 years with Johnny being named as trustee; all earnings from the trust were to be divided equally between

Robert, Wendell and Johnny; after 10 years, the land was to be "equitably and fairly" divided between Robert, Wendell and Johnny; and during the trust period, Robert and Johnny had first option of farming the same tracts they were currently farming. Johnny was named executor of Luella's estate.

Luella executed the will on May 13, 1983, in the presence of Claudon and two secretaries for Claudon's firm, Shirley Kozelichki and Marla Hance. Sue drove Luella to the office but was not present at the will's execution. Claudon testified that he read the entire will to Luella, stopping after each paragraph to explain the will's provisions. In Claudon's opinion, Luella was of sound mind, knew who her children were, and knew what her property was. Claudon did not believe that Luella was under constraints from anyone and that she did not exhibit symptoms of dependency or mental deficiency.

Both Shirley Kozelichki and Marla Hance remembered witnessing Luella's will because Claudon read the will to Luella and this was unusual in the office. Typically, Claudon would allow the testator to read the will to himself or herself. Both Kozelichki and Hance testified that they believed that Luella was of sound mind, that she was not under constraints, and that she understood the content of the will. Johnny was not present when Luella signed the will.

In June 1983, Luella was examined by Dr. Joe Symmonds (Symmonds). Symmonds examined Luella continually during 1983-1984. Luella was being treated for diabetes and arthritis. Although Luella sometimes had mental obtundity, defined as a numbness of mental acuity, she was not being treated for any psychiatric or mental disorders. Symmonds testified that Luella had a passive personality disorder, in which an individual depends on others for his or her positive actions. However, she was not being treated for the disorder, and Symmonds' only reference to the condition was as part of an assessment for medication compliance for her diabetes.

In June 1983, Symmonds found Luella to be doing well; she was walking with a cane, had a good attitude, and her pulse and blood pressure were good. Between April 1983 and May 1984, Symmonds believed that Luella was of sound mind; Luella was not confused during her examinations, was responsive to questions, but was very passive.

On August 18, 1983, Luella and Johnny met with Claudon to discuss the values of the parcels of land. Luella participated in the discussion. Claudon told her she could take a widow's award under Ernest's estate, but Luella elected not to take the award.

On September 9, 1983, Mary, Francis and some of their children stopped by Johnny's unannounced to visit Luella. Sue was not present. Shirley Lynn Plate, Johnny's daughter from his first marriage, was at Johnny's house fixing dinner when Mary and Francis arrived. According to Shirley, Mary and Francis asked to see Luella, and Shirley told them that Luella was asleep, but she would wake her. Mary and Francis went up to Luella's room and began asking Luella questions about what day it was, who the president was and so forth. Luella was groggy and confused and started crying.

Shirley went down to the barn and got Johnny. Johnny came into the house, saw Luella crying, and told Mary and Francis that if they could not visit nicely without upsetting Luella, they would have to leave. Johnny threatened to call the sheriff if Mary and Francis would not leave. When Mary and Francis asked Johnny if they could come back, Johnny replied, "if you can be pleasant about it." Mary and Francis testified that Johnny told them that they were no longer permitted to visit Luella.

After this incident, Wendell and Francis contacted the State's Attorney's office and the Agency on Aging to attempt to arrange visitation with Luella. Wendell and Francis also contacted an attorney, Dixon McRaven, to find a way to determine Luella's health and condition.

On September 14, 1983, McRaven called Claudon concerning Wendell and Francis' visitation. Claudon assured McRaven that Johnny would not stop family members from visiting Luella.

On September 30, 1983, Luella met with Claudon and another attorney in Claudon's firm, Bruce Beal. During the meeting there was a lengthy discussion concerning family background and relationships. Luella indicated that she wanted to give Johnny the home in which he was living and her fractional interest in the farm machinery.

On October 3, 1983, Luella met again with Claudon at his office. She told him she wanted to deed to Johnny the home in which Johnny was living, including the land on which the home was situated consisting of approximately 370 acres. Luella also wished to convey her fractional interest in the farm machinery to Johnny. Claudon discouraged Luella from deeding the property outright because of the tax consequences.

On January 15, 1984, Sue called Mary on the telephone and put Luella on the phone. Luella asked Mary to come over to visit and Robert, Mary and their son James went to see Luella. According to Mary's testimony, Luella was watching television. In the course of their conversation with Luella, Luella thought that she was playing

basketball with the Harlem Globe Trotters, talked about having a daughter named Lisa who could play the piano and dance, and talked about driving into a ditch with Ernest the night before. According to Sue, Robert's visit on January 15, 1984, was the only time he visited Luella while Luella was living with Johnny, and that Robert left within 10 minutes.

Sometime in April 1984, Claudon had a telephone conversation with Luella. Luella indicated that she wanted to change her will to give Johnny the home in which Johnny was living and the farm machinery. Claudon prepared a codicil to this effect.

On May 1, 1984, Luella met with Claudon in his office and they reviewed the codicil. During this meeting, Claudon told Luella that he believed that he had a conflict of interest and suggested that Luella hire another attorney. He gave her the names of several attorneys. Luella chose Charles "Chick" Flack. Later in the day of May 1, 1984, Claudon spoke with Flack and asked him if he would be interested in representing Luella, and Flack agreed. Claudon did not recall whether he gave Luella a copy of the codicil, or whether he mailed it to Flack.

Flack met with Luella three times: first at Johnny's house on May 4, 1984, and again on May 7, 1984, at his office. Flack's third meeting was on May 30, 1984, when Luella signed the codicil. Flack and two of his secretaries witnessed the execution of the codicil. Flack did not have any specific recollection of Luella signing the codicil, but he testified that his usual practice was not to allow a codicil to be executed if he believed a client was not competent.

Sue testified that at one of the meetings at Flack's office, she was called into the office to take care of Luella, who was crying and saying that they were trying to take away her baby and all of her money and property. Flack told Sue that Luella could not sign anything that day.

Flack drafted the codicil, but stated that the "wording was put together" by Claudon. The codicil that Luella signed was substantially the same as the codicil drafted by Claudon, with only minor changes.

One of the secretaries who witnessed Luella's codicil, Linda Sue Shogren, did not recall signing the codicil, but testified that she would not have signed as a witness if she did not believe that Luella was of sound mind. The other witness, Delores Gayle Howarth, testified in a deposition that Luella was able to walk on her own and that she believed that Luella was of sound mind.

Luella died May 31, 1988. Her will and codicil were admitted to probate June 8, 1988. Robert and Wendell filed separate petitions to contest the will and codicil. The actions were consolidated by the trial

court. Following a six-day jury trial, a verdict was returned on June 11, 1991, in favor of Johnny, validating the will and codicil.

Before the trial, on August 28, 1989, Sue gave a sworn statement that Luella was a bright, competent individual who knew what she was doing and that Luella discussed the farming operations in detail with Johnny. Sue recanted this statement at trial, saying that she feared that she would be beaten by Johnny if she said otherwise.

## I. MANIFEST WEIGHT OF THE EVIDENCE

Petitioners first argue that the jury's finding that Luella's will and codicil were valid was against the manifest weight of the evidence for two reasons: (1) Johnny's alleged undue influence over Luella; and (2) Luella's alleged lack of testamentary capacity. We will address each argument in turn.

The Illinois Supreme Court has defined "undue influence" as " 'any improper *** urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.' " *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 460, 448 N.E.2d 872, quoting *Powell v. Bechtel* (1930), 340 Ill. 330, 338, 172 N.E. 765.

In order to set a will aside, the undue influence " 'must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another.' " *Franciscan Sisters*, 95 Ill. 2d at 460, quoting *Breault v. Feigenholtz* (1973), 54 Ill. 2d 173, 181, 296 N.E.2d 3.

A rebuttable presumption of undue influence arises when a petitioner is able to establish four elements:

" ' "(1) a fiduciary relationship between testator and a person who receives a substantial benefit under the will (compared to other persons who have an equal claim to testator's bounty);

(2) a testator in a dependent situation in which the substantial beneficiaries are in dominant roles;

(3) a testator who reposed trust and confidence in such beneficiaries; and

(4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated." ' " *In re Estate of Henke* (1990), 203 Ill. App. 3d 975, 978, 561 N.E.2d 314, quoting *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 960, 466 N.E.2d 977, quoting *Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 436-37, 369 N.E.2d 1320.

If a petitioner is successful in establishing all four of the above-listed elements, the burden of production shifts to the respondent, who must produce evidence that rebuts the presumption of undue influence. (*Franciscan Sisters*, 95 Ill. 2d at 462; *Henke*, 203 Ill. App. 3d at 979.) It is important to note that the burden of persuasion remains with the petitioner. *Franciscan Sisters*, 95 Ill. 2d at 462.

Petitioners in the instant case argue that they presented sufficient evidence "to support a strong inference of undue influence." They assert that Johnny "failed to present sufficient evidence to counter plaintiffs' presumption of undue influence."

On the other hand, Johnny argues that the trial court found as a matter of law that respondent had overcome the presumption, and that the court went beyond what was required by the law in giving the Illinois Pattern Jury Instruction, Civil, No. 200.03 (3d ed. 1992) (IPI Civil 3d). Johnny supports his argument by pointing to a statement made by the trial judge in response to petitioners' arguments regarding petitioners' proposed instruction on specific acts of undue influence, IPI Civil 3d No. 200.04. The trial court stated:

"I have to disagree, Mr. Tucker. I don't think that there is evidence in the record of the kind of specific acts to which that instruction refers.

There is certainly evidence in the record of all the things that you indicate, and I think that those—that evidence goes to those elements set forth in [IPI Civil 3d No.] 200.03, and that evidence to rebut at least the interpretation in each of these acts have [*sic*] been presented in the record."

We disagree with Johnny's argument that the trial court made a finding as a matter of law that Johnny rebutted the petitioners' presumption of undue influence. It is apparent that the trial court did not make a finding as a matter of law, but rather observed that there was sufficient evidence presented to establish the basic facts that amount to a rebuttable presumption, and that Johnny presented evidence attacking the basic facts of the presumption.

In light of the considerable confusion engendered by the parties on this issue, we believe it is appropriate to briefly discuss the procedural effect of the rebuttable presumption in the context of IPI Civil 3d No. 200.03. A party can attack a presumption in two ways. He may:

"[I]ntroduce evidence tending to disprove the existence of the basic facts on which the presumption depends, or he may offer evidence tending to disprove the presumed fact itself." M. Gra-

ham, Cleary & Graham's Handbook of Illinois Evidence §302.4, at 87 (5th ed. 1990).

"Basic facts" are defined as the historical and narrative accounts given by testimony during trial, or admitted by stipulation or not denied in responsive pleadings that establish the individual elements of the presumption. (*Universal Minerals, Inc. v. C.A. Hughes & Co.* (3d Cir. 1981), 669 F.2d 98, 102.) The "presumed fact" is "[t]he fact that is presumed once the basic facts have been proven." C. Fishman, Jones on Evidence §4:3, at 306 (7th ed. 1992).

The distinction as to whether a party attacks the basic facts or the presumed fact is critical as to the procedural effect.

"If the attack is solely by introducing evidence to disprove the basic facts, then an issue of fact is presented as to their existence. This issue should be presented to the jury under an instruction outlining the result that follows success or failure in proving the basic facts." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §302.4, at 87 (5th ed. 1990).

However, if a respondent attacks the presumed fact, then a different procedural route must be followed:

"If the defendant attacks the *presumed* fact (that is, produces evidence that he did not exert undue influence over the decedent), then the court must determine whether the presumption remains. Whether the presumption has been overcome is always a question for the court. *In re Estate of Berry*, 170 Ill. App. 3d 454, 524 N.E.2d 689, 694, 120 Ill. Dec. 659, 664 (4th Dist. 1988). If the court determines that the defendant has produced sufficient evidence to overcome the presumption, the 'bubble bursts' and the presumption disappears from the case. The plaintiff must then rely on specific evidence of actual undue influence or some other theory of invalidity. The jury is given the usual issues and burden of proof instructions, but the presumption is gone and the jury is told nothing about the presumption.

If the defendant's evidence is insufficient to rebut the presumption, then the presumption remains operative. If the defendant has not attacked the basic facts or if the evidence of the basic facts is so favorable to the plaintiff that it satisfies the *Pedrick* [*v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504] standard, then the court will direct a verdict for the plaintiff. Otherwise, the case will be submitted to the jury under this instruction for the jury to determine the ba-

sic facts." (Emphasis in original.) IPI Civil 3d No. 200.03, Comment, Procedural Effect, at 200—19.

Parenthetically, a respondent could attack both the basic facts and the presumed fact. The same evidentiary analysis would apply. The trial court must still make a finding as a matter of law whether the presumption itself has been rebutted. If the trial court finds that the presumed fact has been rebutted, the presumption vanishes from the case. The petitioner is then left to rely on other means of proving undue influence, if any. If the trial court finds that the presumed fact has not been rebutted, then the jury must determine whether the basic facts have been proved. IPI Civil 3d No. 200.03, Comment, Procedural Effect.

It should be noted that the supreme court has expressly adopted the Thayer "bursting-bubble hypothesis," that is, once a party introduces sufficient evidence to rebut the presumption, the "bubble bursts" and the presumption disappears. *Franciscan Sisters*, 95 Ill. 2d at 462.

■ In the instant case, since it appears that Johnny attacked only the basic facts of the presumption, it was proper for the trial court to submit the case to the jury to decide whether petitioners established the basic facts of undue influence. Because Johnny did not attack the presumed fact, it was not necessary or proper for the trial court to make a finding as to whether Johnny "burst the bubble" of the presumption.

In their brief, petitioners ask this court to find a clear and convincing standard of proof for Johnny to rebut the presumption of undue influence. Typically, the quantum of proof necessary to rebut a presumption has been a flexible standard dependent upon the strength of the presumption raised. (*Franciscan Sisters*, 95 Ill. 2d at 463.) However, both the *Franciscan Sisters* and *Henke* courts recognized an exception to this flexible standard of proof to rebut a presumption of undue influence where the fiduciary relationship of the testator and the beneficiary was such that a great deal of confidence was reposed in the beneficiary. (*Franciscan Sisters*, 95 Ill. 2d at 465; *Henke*, 203 Ill. App. 3d at 980.) In such cases, a clear and convincing standard of proof is appropriate for policy reasons because of the potential of abuse that accompanies such fiduciary relationships. *Franciscan Sisters*, 95 Ill. 2d at 465; *Henke*, 203 Ill. App. 3d at 980.

A fiduciary relationship may be found in one of two situations: (1) as a matter of law, which can be ascertained from the recognized relationship of the parties, such as an attorney-client relationship; or (2) from the facts of a particular situation, where there is trust reposed

on one side and resulting superiority and influence on the other. (*In re Estate of Rothenberg* (1988), 176 Ill. App. 3d 176, 179, 530 N.E.2d 1148.) A fiduciary relationship does not automatically exist as a matter of law simply because the parties are parent and child. (*Henke*, 203 Ill. App. 3d at 981.) Some of the factors that are considered in determining whether a fiduciary relationship exists are degree of kinship, disparity in age, health, mental condition, education, and whether a servient party entrusted a dominant party with the handling of their business or financial affairs. *Henke*, 203 Ill. App. 3d at 981.

■ Here, because Luella essentially gave over the operation of the farming enterprise and her personal finances to Johnny, a fiduciary relationship did exist, and it would be appropriate to impose a clear and convincing standard of proof on Johnny to rebut petitioners' presumption of undue influence. (*Henke*, 203 Ill. App. 3d at 981.) But, because petitioners did not request an instruction for a clear and convincing standard to be imposed, this issue is not before us and will not be considered. (*First National Bank & Trust Co. v. City of Rockford* (1977), 47 Ill. App. 3d 131, 137, 361 N.E.2d 832.) However, even if the jury were faced with determining whether Johnny had rebutted the presumption using a clear and convincing standard, the evidence would have been sufficient to support the jury verdict.

■ The jury found that Johnny did not unduly influence Luella into creating the will and codicil at issue. We agree. The law of this State is well established that when a jury is presented with an issue of undue influence in a will contest, and the evidence is conflicting such that there is sufficient evidence to sustain a verdict for either side, the jury is in a better position to resolve the factual issues than the reviewing court, and a judgment upholding the will's validity will not be reversed unless the verdict is against the manifest weight of the evidence. *Sterling v. Dublin* (1955), 6 Ill. 2d 64, 74, 126 N.E.2d 718.

Luella's will divided her estate equally among her three sons. The terms of her will were developed during a meeting between Luella and Claudon on April 22, 1983. Johnny was not present. The will was executed on May 13, 1983, in the presence of Claudon and two witnesses, Shirley Kozelichki and Marla Hance. Claudon gave uncontroverted testimony that when Luella signed the will, he believed that she was of sound mind, knew what her property was and who her children were. Claudon did not observe Luella exhibit any symptoms of dependency or mental deficiency, nor did he believe that Luella was under constraint to execute the will. Likewise, both witnesses testi-

fied that they believed that Luella was of sound mind, that she was not under constraints, and that she understood the content of the will. Again, Johnny was not present when Luella signed the will. We hold that this evidence is sufficient to sustain the jury's verdict.

The substantive bequests in the codicil were discussed at a meeting between Claudon, Bruce Beal and Luella on September 30, 1983. Johnny was not present at this meeting. Again Luella expressed her desire to give Johnny the home in which he was living, the land and fractional interest in the farm machinery during a meeting with Claudon on October 3, 1983. Claudon discouraged Luella from deeding the property to Johnny because of tax consequences. Johnny was not present at this meeting. In April 1984, Luella told Claudon over the telephone that she wished to change her will to give Johnny the home in which Johnny was living and the land and fractional interest in the farm machinery. Claudon prepared a codicil according to Luella's instructions, but withdrew as her attorney because he perceived a conflict of interest. Luella hired Flack to act as her attorney.

Flack's recollections of his conferences with Luella were limited to notations in his appointment book and his billing records. However, Flack did testify that his ordinary practice was not to allow a will or codicil to be executed if he believed the client was not of sound mind, was under constraints or was being controlled by someone. There was nothing remarkable about Luella's behavior that caused Flack to believe that Luella was not able to execute a valid codicil. Of the two witnesses to Luella's codicil, only one of the witnesses had a recollection of Luella's execution of the codicil. Delores Gayle Howarth remembered Luella's execution of the codicil and testified that Luella was able to walk on her own and that she believed that Luella was of sound mind. The third witness, Linda Sue Shogren, testified that she would not have signed as a witness if she believed that Luella was not of sound mind. Johnny was not present at the execution of the codicil. This evidence is sufficient to support the jury verdict.

We turn next to petitioners' argument that Luella lacked the requisite mental capacity at the time she executed her will and codicil. The law of this State presumes every person to be sane until the contrary is shown, and the burden of proof rests with the party asserting that another lacked the requisite testamentary capacity at or near the time the will was executed. (*Manning v. Mock* (1983), 119 Ill. App. 3d 788, 804, 457 N.E.2d 447.) Testamentary capacity requires that an individual have sufficient mental ability to know and remember the natural objects of his or her bounty, to comprehend the kind and character of his or her property, and to make dispositions of his or her

property in a manner according to his or her own design. *In re Estate of Wrigley* (1982), 104 Ill. App. 3d 1008, 1017, 433 N.E.2d 995.

The courts have generally classified the medical reasons for lack of capacity as being old age, illness, or insane delusions. This list is not exhaustive. (See IPI Civil 3d No. 200.10, Comment.) Our supreme court has stated that "[n]either old age, nor feeble health, nor both, although combined with defective memory, will constitute lack of testamentary capacity." (*Challiner v. Smith* (1947), 396 Ill. 106, 124, 71 N.E.2d 324.) This court has recognized a very narrow objection to testamentary capacity when the objection is based on an insane delusion. (*In re Estate of Stuhlfauth* (1980), 88 Ill. App. 3d 974, 982, 410 N.E.2d 1063.) The delusion must be in regard to the objects of the testator's bounty. (*Stuhlfauth*, 88 Ill. App. 3d at 982.) Whether a petitioner's attack is based on old age, illness, insane delusion or some other reason, the central inquiry remains whether the testator knew the natural objects of her bounty, knew the kind and character of her property and disposed of her property according to her own design. *Wrigley*, 104 Ill. App. 3d at 1017.

■ Although petitioners introduced extensive lay witness testimony as to Luella's occasional peculiar behavior, petitioners did not attempt to specifically characterize Luella's behavior in terms of whether she was suffering from old age, illness or insane delusions. We believe there was sufficient evidence to support the finding that she possessed the requisite mental state to execute a valid will and codicil. Claudon's testimony about his initial discussions with Luella concerning the disposition of her property and her desire to maintain Robert's and Johnny's right to farm the same parcels they had been farming showed that Luella knew the nature of her bounty at the time of the execution of her will. Claudon's testimony regarding Luella's desire to give Johnny the home, land and interest in the farming equipment also illustrates that Luella did not suffer from delusions regarding her property or her bounty at the period before the execution of the codicil. It was within the discretion of the jury to weigh and consider the credibility of the witnesses. We affirm the jury's verdict on this issue.

## II. DEAD MAN'S ACT

Petitioners argue that when opposing counsel's cross-examination of Sue went beyond the scope of the direct examination, the trial court erred in subsequent rulings that Johnny had not waived the protections of the Dead Man's Act (Act) (Ill. Rev. Stat. 1989, ch. 110, par. 8—201). Specifically, petitioners point to the following statements

made by Sue on cross-examination to support their argument: that Wendell only came to visit Luella four times a year; that Robert had a poor relationship with Luella; that Robert did not come to Ernest's funeral; that Robert said "tell me when it's over" when leaving the hospital before Luella died; that Robert's children visited Luella only a few times per year; that Mary helped Sue with Luella when Luella first moved into Johnny's house; and that Mary wished to place Luella in a nursing home.

Under the Dead Man's Act, adverse parties or persons directly interested in an action are not allowed to testify to conversations with the deceased or to events which took place in the deceased's presence. The purpose of the Act is to protect decedents' estates from fraudulent claims. (*Kamberos v. Magnuson* (1987), 156 Ill. App. 3d 800, 804, 510 N.E.2d 112, *appeal denied* (1987), 116 Ill. 2d 559.) A trial court's ruling on an issue involving the Dead Man's Act will not be reversed unless the error was substantially prejudicial and affected the outcome of the trial. (*White v. Raines* (1991), 215 Ill. App. 3d 49, 60, 574 N.E.2d 272.) The party seeking reversal bears the burden of establishing prejudice. *White*, 215 Ill. App. 3d at 60.

Sue's testimony on direct examination initially focused on her relationship with Johnny and his parents and her observations of Luella's condition before and after the stroke. Sue was then asked:

"Q. Next I want to talk about what was happening in '83 and '84 between your home and the homes of Robert and Wendell. Did Johnny give you any instructions about contacts that Wendell or Robert or the family would try to make with Mrs. Kline?

A. Well, it was mostly Wendell and Francis. Robert never did come out. If they called I was to tell them that we were busy, or Mrs. Kline was sleeping, or I was going out with Mrs. Kline."

■ Our review of the record reveals that some of Sue's testimony on cross-examination was in response to the direct examination, specifically, the statements made by Sue regarding visitation of Luella by the petitioners and their families. These inquiries were within the scope of the direct examination, were proper attempts to impeach Sue, and did not constitute a waiver of the Dead Man's Act. (*Nardi v. Kamerman* (1990), 196 Ill. App. 3d 591, 601, 554 N.E.2d 397.) Further, responses to several of these statements came before the jury by some of petitioners' other witnesses. Mary testified that Robert had difficulty in dealing with his father and that all of the business was

conducted through her. Wendell testified as to the meeting that occurred at Johnny's home the day after Ernest's funeral.

As to the balance of petitioners' objections, they have failed to establish, other than in a conclusory manner, that they were prejudiced by the statements. (*White*, 215 Ill. App. 3d at 60.) It is within the discretion of the trial court to determine whether such testimony is necessary for a full and fair presentation of the facts of the case. (*White*, 215 Ill. App. 3d at 60.) Petitioners have failed to show that the trial court abused its discretion in this regard.

### III. CUMULATIVE ERROR

We turn next to petitioners' arguments involving the cumulative error of the trial court in regard to various evidentiary rulings. The arguments will be addressed in turn.

Petitioners first assert that the trial court erred in allowing Johnny to recall Sue as a witness for the sole purpose of impeachment of a prior conviction. While Sue was on the witness stand during petitioners' case, petitioners moved *in limine* to prevent Johnny from questioning Sue about the convictions because Sue had not yet been sentenced. The trial court granted this motion. Later, Johnny called Sue as a hostile witness during his case because Sue had been sentenced in the interim. Petitioners objected to Johnny recalling Sue, and the trial court overruled the objection. Petitioners argue that recalling Sue for the sole purpose of this impeachment was prejudicial in that it focused on the convictions and magnified them.

A trial court's ruling on a party's request to call a witness as an adverse witness is committed to the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion resulting in manifest prejudice. (*King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 913, 513 N.E.2d 958, *appeal denied* (1987), 117 Ill. 2d 544.) According to Supreme Court Rule 238(a), "[t]he credibility of a witness may be attacked by any party, including the party calling him." (134 Ill. 2d R. 238(a).) Under section 6 of "An Act to revise the law in relation to criminal jurisprudence" (Ill. Rev. Stat. 1989, ch. 38, par. 155—1), "[n]o person shall be disqualified as a witness *** by reason of his or her having been convicted of any crime; but such *** conviction may be shown for the purpose of affecting the credibility of the witness." A verdict of guilty does not become a conviction until sentence is imposed. *People ex rel. Grogan v. Lisinski* (1983), 113 Ill. App. 3d 276, 281, 446 N.E.2d 1251.

In the instant case, when Sue was on the witness stand during petitioners' case, she had not been sentenced. The trial court was

correct in not allowing Johnny to impeach Sue at that time. (*Grogan*, 113 Ill. App. 3d at 281.) However, when Sue was called by Johnny during his case, Sue had been sentenced. At this point Johnny could call Sue as a witness for the purpose of impeachment. (134 Ill. 2d R. 238(a).) We hold that the trial court did not abuse its discretion in allowing Johnny to call Sue for the sole purpose of impeachment.

Petitioners next assert that they were deprived of a fair trial due to the prejudicial comments made by Johnny's counsel during closing argument regarding one of petitioners' witnesses. The statement at issue was as follows: "I think the judge aptly said it. He'd never seen anybody jump out of that chair so fast *** ." The source of this statement was from a comment made by the trial judge during an in-chambers conference with the parties' counsels.

Petitioners immediately objected, and the trial court sustained the objection. The court then instructed the jurors to strike the comment from their minds. The jury was also given IPI Civil 3d No. 1.01(8), which states: "Neither by these instructions nor by any ruling or remark which I have made do I or have I meant to indicate any opinion as to the facts."

Comments made during closing argument that are prejudicial may be grounds for a new trial where the complaining party has been prejudiced and a timely and proper objection was made. (*Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 581, 573 N.E.2d 1315.) A reviewing court will not reverse a judgment for improper comments made during closing argument unless it appears from a review of the trial as a whole, that the comments were clearly improper and prejudicial and prevented the complaining party from receiving a fair trial. *Skelton*, 214 Ill. App. 3d at 581-82.

▮ We find that the trial court's immediate cautionary instruction on the improper comment and the subsequent jury instruction cured any prejudicial effect of the comment. (*McCray v. Salah Uddin Shams* (1992), 224 Ill. App. 3d 999, 1006, 587 N.E.2d 66.) The trial court did not err in denying petitioners' mistrial motion.

Petitioners next argue that the trial court erred in allowing the attorney, Chet Claudon, to use notes that were not revealed during discovery. Petitioners claim that they should have received these notes in response to the following request for production of documents: "All documents relating to the medical physical or mental condition of Luella Kline at any time in the last six years." Petitioners also claim that when Claudon was deposed, he denied making any notes regarding Luella's will other than a short note admitted as exhibit 3.

Johnny asserts that Claudon never denied the existence of the notes, that petitioners knew that the notes existed and they never requested them. To support this argument, Johnny points to Claudon's deposition testimony.

"Q. Would you state very briefly the subject area you specifically recall.

A. I specifically recall discussing the estate with him [Johnny]. It was the first meeting of going over the general assets of the estate. They were both here [Johnny and Luella], and I also felt that somewhere in there, there was discussion of the fact it was an unhappy situation, and the father didn't have a will. I probably asked the question why didn't he have a will, and I think she [Luella] indicated she wanted to have one.

Q. Did you make any notes that day?

A. *Yes, I did.*

Q. Do you still have them?

A. *Yes, I do.*

Q. Did you make any notes with respect to Luella's Will?

A. Yes.

Q. Do you still have them?

A. Here in the office.

Q. Do you have them readily available?

A. Yes.

Q. Could I see them?

A. This is [*sic*] conference notes of April 22nd. It says, 'Will for Mrs. Kline named Executor Johnny, without bond, and then to each of the boys, or their heirs, per stirpes.' This was a note of April 22nd. *There also were separate notes of the conference [sic] which was only involving the estate. No notations of a will or anything, but it was a list of assets and that type of thing, getting ready for the inventory.* These notes right here simply were to trigger my memory, and probably the same day or day after I dictated the Will with the trust." (Emphasis added.)

From our review of the record, the above-quoted testimony was sufficient notice of the existence of two separate sets of notes: the first from the April 22, 1983, meeting between Claudon, Johnny and Luella dealing with the assets of Ernest's estate, and the second from the April 22, 1983, meeting between Claudon and Luella dealing with Luella's will.

Sanctions for refusing to comply with discovery requests are available pursuant to Supreme Court Rule 219(c) and may, among other remedies, result in barring a witness from testifying. (134 Ill. 2d

R. 219(c).) The imposition of sanctions is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. (*Zimmer v. Melendez* (1991), 222 Ill. App. 3d 390, 395, 583 N.E.2d 1158, *appeal denied* (1992), 145 Ill. 2d 645.) The purpose of discovery sanctions is not to punish, but rather, to effect discovery. (*Zimmer*, 222 Ill. App. 3d at 395.) In determining whether sanctions are appropriate, this court looks to several factors: surprise to the opposing party, prejudicial effect of the testimony, the opposing parties' diligence in pursuing discovery, timely objection to the testimony, and the good faith of the party offering the testimony. Of these factors, no single factor is determinative. *Zimmer*, 222 Ill. App. 3d at 395-96.

In the instant case, petitioners' request for documents dealing with the "medical physical or mental condition" of Luella was not broad enough to bring the first set of notes within the request. These notes contain a partial inventory of Ernest's assets and nothing more. The trial court did not abuse its discretion in refusing to impose discovery sanctions.

Petitioners next assert that the trial court erred in refusing to admit exhibits pertaining to certain hospital records. The records at issue involved Ernest's admission to the hospital on February 7, 1983, and on March 3, 1983, that listed Johnny as the person to contact. Petitioners contend that these records tended to show Johnny's control over Luella and that the trial court committed reversible error in refusing to admit them into evidence.

Evidence is relevant if it tends to show the existence of any fact that is of consequence to the determination of the action by making it more probable or less probable than it would be without the evidence. (*In re Elias* (1986), 114 Ill. 2d 321, 334, 499 N.E.2d 1327, *cert. denied* (1987), 480 U.S. 907, 94 L. Ed. 2d 521, 107 S. Ct. 1351, quoting Fed. R. Evid. 401.) In determining relevancy of evidence, a trial court must consider the evidence in light of the factual issues raised by the pleadings. (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 496, 464 N.E.2d 751.) A trial court's ruling on evidence based on relevance is within its discretion and will not be reversed on appeal absent an abuse of discretion. *Carlyle*, 124 Ill. App. 3d at 496.

While the evidence at issue may be relevant, the trial court did not abuse its discretion in denying its admission. We agree with the trial court that the evidence was subject to more than one interpretation and, therefore, its relevancy was outweighed by the possible confusion that the evidence would cause the jury.

Petitioners also argue that the trial court erred in several evidentiary rulings involving their theories of undue influence and lack of

testamentary capacity. The first ruling involved two witnesses for petitioner who were to testify about an incident occurring in 1986. According to petitioners' offer of proof, two employees of the Department of Transportation approached Luella about a right-of-way over her property for the construction of a bridge. Luella started crying during the conversation and refused to sign the document. Johnny came in, calmed Luella down, and got her to sign the agreement. The trial court refused to admit this testimony on the grounds that the event was too remote from the execution of the will and codicil.

Again, evidentiary rulings involving relevancy are within the discretion of the trial court and will not be reversed absent an abuse of discretion. (*Carlyle*, 124 Ill. App. 3d at 496.) Generally, evidence of matters occurring before, during or after the execution of a testamentary instrument are admissible, so long as the evidence tends to show the testator's mental capacity at the time of the execution of the instrument. *In re Estate of Wrigley* (1982), 104 Ill. App. 3d 1008, 1017, 433 N.E.2d 995.

We hold that the trial court did not abuse its discretion in refusing to allow the testimony regarding an event occurring years after the execution of the will and the codicil. This event is simply too remote from the execution of the instruments at issue. Petitioners have failed to show that the event occurring in 1986 had any relation to the mental condition of Luella at the time she executed her will in 1983 and codicil in 1984. *In re Estate of Mooney* (1983), 117 Ill. App. 3d 993, 999, 453 N.E.2d 1158.

Petitioners next assert that the trial court abused its discretion in refusing to allow testimony from Wendell regarding a statement made to Wendell by a deputy sheriff concerning Johnny's violent propensities. During Wendell's direct examination, he began to refer to his conversation with the deputy. Wendell's attorney stopped him and approached the bench for a conversation off the record. After Wendell finished testifying and the jury was excused, his attorney made a record that Wendell was about to testify concerning the deputy's statement, but the judge did not feel that the testimony was appropriate.

We note that petitioners have failed to support their argument with any citation of legal authority. A reviewing court is not a depository in which a litigant may leave the burden of argument and research. As such, we consider this aspect of the issue waived. *Inland Real Estate Corp. v. Village of Palatine* (1986), 146 Ill. App. 3d 92, 98, 496 N.E.2d 998, *appeal denied* (1986), 113 Ill. 2d 560.

Petitioners' final claim of error is that the trial court abused its discretion in refusing to allow one of petitioners' witnesses to tes-

tify that she saw Luella hold a dog in her arms, rock it and speak to it as if it were human. This event occurred sometime between 1980 and 1982. Petitioners made an offer of proof as to the testimony, but the trial court refused to allow it.

We hold that the trial court did not abuse its discretion in refusing to allow the testimony at issue. (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 496, 464 N.E.2d 751.) Petitioners have failed to show that the witnesses' testimony had any relation to the mental condition of Luella at the time she executed her will in 1983 and codicil in 1984. *In re Estate of Mooney* (1983), 117 Ill. App. 3d 993, 999, 453 N.E.2d 1158.

Because we find no prejudicial error or abuse of discretion resulting from the various rulings of the trial court objected to by petitioners, there can be no cumulative error on the part of the trial court. The trial court is affirmed on each claim of error.

### IV. JURY INSTRUCTION

We turn to the last issue raised by petitioners, whether it was error for the trial court to refuse to give IPI Civil 3d No. 200.04. This instruction allows the jury to consider specific conduct alleged to constitute undue influence. Petitioners argue that there was sufficient evidence of specific acts on the part of Johnny and his "agents," Sue and Claudon, to warrant the use of this instruction. Specifically, petitioners point to the following facts to support their argument: that Johnny told Mary that "it was going to be different the second time around"; that Johnny required Sue to sit with Luella during Ernest's funeral; that Sue directed Luella on how to talk to people on the street; that Johnny instructed Sue to not let family members talk to Luella on the phone; and that Claudon drafted the will and codicil while admitting that he had a conflict of interest.

Undue influence is defined in IPI Civil 3d No. 200.09 as "influence exerted at any time upon the decedent which cause[d] her to make a disposition of her property that [was] not her free and voluntary act." The commentary to the instruction notes:

> "The phrase 'at any time' is included in the instruction to make clear that the influence need not have been exerted at the time the document was signed in order to have caused its execution. It is necessary only that the influence be operative at the time the document is executed." (IPI Civil 3d No. 200.09, Comment, at 200—29.)

While it is unnecessary to set forth specific conduct at the time that the testamentary instrument is executed, a party must establish that

436

specific acts of undue influence over the testator occurred, that the specific acts were directly connected to the testator's execution of the will or codicil, and that the undue influence was operative at the time of the testamentary instrument's execution. See *Mosher v. Thrush* (1949), 402 Ill. 353, 357-58, 84 N.E.2d 355.

● ■ In the instant case, petitioners did not set forth facts sufficient to warrant IPI Civil 3d No. 200.04. None of the facts relied upon by petitioners indicate specific acts of influence directed towards Luella for the procurement of a testamentary instrument in their favor. The facts tend to establish the basic facts necessary to form the presumption of undue influence as provided in IPI Civil 3d No. 200.03, which was given. The trial court did not err in refusing to give IPI Civil 3d No. 200.04.

We affirm the trial court on all issues.

Affirmed.

BRESLIN and STOUDER, JJ., concur.